KILPATRICK TOWNSEND & STOCKTON LLP
STEVEN D. MOORE (State Bar No. 290875)
smoore@ktslaw.com
MEHRNAZ BOROUMAND SMITH (State Bar No. 197271)
mboroumand@ktslaw.com
CECELIA A. RIVERA (State Bar No. 357220)
crivera@ktslaw.com
Two Embarcadero Center, Suite 1900
San Francisco, California 94111
Telephone: (415) 576-0200
Facsimile: (415) 576-0300

RISHI GUPTA (State Bar No. 313079)
rgupta@ktslaw.com
SARAH Y. KAMRAN (State Bar No. 347617)
skamran@ktslaw.com
1801 Century Park East, Suite 2300
Los Angeles, California 90067
Telephone: (310) 248-3830
Facsimile: (310) 860-0363

Attorneys for Defendant
KENNAMETAL INC.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| MACHININGCLOUD, INC., a California Corporation; and MACHINING CLOUD GMBH,<br><br>Plaintiffs,<br><br>v.<br><br>KENNAMETAL INC., a Pennsylvania Corporation,<br><br>Defendant. | Case No. 2:25-cv-02158-SB-AJR<br><br>**KENNAMETAL INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT AND COUNTERCLAIMS**<br><br>SAC Filed: July 29, 2025 |

Defendant Kennametal Inc. ("Kennametal" or "Defendant") hereby submits its Answer and Defenses to the Second Amended Complaint for (1) Breach of Contract, (2) Breach of Implied Covenant of Good Faith and Fair Dealing, (3) Violation of Defend Trade Secrets Act, (4) Violation of California Uniform Trade Secrets Act, (5) Accounting, (6) Declaratory Relief – Correction of Inventorship, (7) Declaratory Relief – Non-Infringement of Patents, and (8) Declaratory Relief – Invalidity of Patents ("Second Amended Complaint") filed by MachiningCloud, Inc. and Machining Cloud GMBH ("MachiningCloud" or "Plaintiffs") on July 29, 2025, and its Counterclaims, as follows:

## I.    INTRODUCTION[1]

1.    Kennametal denies the allegations in Paragraph 1.

2.    Kennametal admits that it is a global, industrial company specializing, among other things, in the production of metalworking tools and engineered components used throughout the industrial production process. Kennametal admits that it sought to develop a software platform and worked with the alleged predecessors of Plaintiffs to do so. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 2.

3.    Kennametal admits that it worked with the alleged predecessors of Plaintiffs to develop the software system that enabled consumers to browse and select cutting tools and electronically prepare tool assemblies for purchase. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 3.

4.    Kennametal admits it entered into an Agreement dated May 26, 2011, with DP Technology Corp. and DP Technology Switzerland GmbH to develop a

---

[1] Kennametal repeats the headings (but not the subheadings) set forth in the Second Amended Complaint to simplify comparison with this response.  In doing so, Kennametal makes no admissions regarding the substance of the headings, subheadings or any other allegations of the Complaint.

software solution now known as "Novo." The terms regarding confidentiality and any payments are set forth in the Agreement. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 4.

5.      Kennametal admits that it provided data to the alleged predecessors of Plaintiffs for the Novo platform, including its trade secrets and other confidential information. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 5.

6.      Kennametal admits that the Agreement dated May 26, 2011, provides for the payment of commissions as specified therein. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 6.

7.      Kennametal admits that it entered into an Agreement dated May 26, 2011, with DP Technology Corp. and DP Technology Switzerland GmbH that contained confidentiality provisions. Kennametal lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 7 concerning MachiningCloud's allegedly "reasonable and diligent steps" to protect its alleged confidential, proprietary, and trade secret information, and therefore denies them. Kennametal admits that it entered into a November 13, 2009 Agreement with DP Technology Corp. and DP Technology Switzerland GmbH. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 7.

8.      Kennametal denies the allegations and characterizations in Paragraph 8.

9.      Kennametal denies the allegations and characterizations in Paragraph 9.

10.     Kennametal denies the allegations and characterizations in Paragraph 10.

11.     Kennametal denies that commissions are owed. Kennametal lacks knowledge or information sufficient to form a belief as to all other allegations and characterizations of Paragraph 11, and therefore denies them.

12.     Kennametal admits that it received a non-specific audit request from

MachiningCloud and responded by providing with sales data "made by or through the use of" Novo. Kennametal lacks knowledge or information sufficient to form a belief as to the allegations and characterizations of Paragraph 12 concerning MachiningCloud's business valuation and speculation on prospective acquisition, and therefore denies them. Kennametal denies the remaining allegations and characterizations in Paragraph 12.

13.     Except as to the fact that MachiningCloud has filed this lawsuit making the allegations described, the substance of which Kennametal disputes, Kennametal denies the allegations and characterizations in Paragraph 13.

## II.     THE PARTIES

14.     Kennametal is informed and believes and, on that basis, admits that MachiningCloud, Inc. is a California corporation and has an office in Ventura County, California. Kennametal lacks knowledge or information sufficient to form a belief as to the allegations and characterizations of Paragraph 14, and therefore denies them.

15.     Kennametal is informed and believes and, on that basis, admits that MachiningCloud GMBH is organized under the laws of Switzerland. Kennametal lacks knowledge or information sufficient to form a belief as to the allegations and characterizations of Paragraph 15, and therefore denies them.

16.     Kennametal admits that it is a corporation formed in Pennsylvania that conducts business throughout the State of California.

17.     Kennametal denies the allegations and characterizations in Paragraph 17.

18.     Kennametal admits the allegations and characterizations in Paragraph 18.

## III.     JURISDICTION AND VENUE

19.     Kennametal admits the allegations and characterizations in Paragraph 19.

20.     Kennametal admits the allegations and characterizations in Paragraph 20.

## IV.    GENERAL ALLEGATIONS

### A.    MachiningCloud and Kennametal Enter into the Agreement

21.     Kennametal admits that it entered an agreement with DP Technology Switzerland GmbH and DP Technology, Corp.  Kennametal lacks knowledge or information sufficient to form a belief as to the remaining allegations and characterizations of Paragraph 21, and therefore denies them.

22.     Kennametal admits it is a multinational manufacturer and distributor of tools, components, and products used in machining and manufacturing with an expansive product catalog. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 22.

23.     Kennametal admits it entered into an Agreement dated May 26, 2011, with DP Technology Corp. and DP Technology Switzerland GmbH to develop a software solution known as "Novo" to enable nationwide consumers to browse and select Kennametal cutting tools, prepare tool assemblies, and purchase tools. Kennametal further agrees that the Agreement is attached as Exhibit A to the First Amended Complaint. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 23.

24.     Kennametal denies the allegations and characterizations in Paragraph 24.

25.     Kennametal admits that Paragraph 25 accurately quotes certain portions of §§ 9.4, 9.5 and 9.7 from an Agreement dated May 26, 2011, with DP Technology Corp. and DP Technology Switzerland GmbH. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 25.

26.     Kennametal admits that Paragraph 26 accurately quotes certain portions of §§ 2.6, 7.1, 7.2 and 7.3 from an Agreement dated May 26, 2011, with DP Technology Corp. and DP Technology Switzerland GmbH. Except as specifically

admitted, Kennametal denies the allegations and characterizations contained in
Paragraph 26.

27.    Kennametal admits that Paragraph 27 accurately quotes certain portions
of certain definitions from an Agreement dated May 26, 2011, with DP Technology
Corp. and DP Technology Switzerland GmbH. Except as specifically admitted,
Kennametal denies the allegations and characterizations contained in Paragraph 27.

28.    Kennametal admits that Paragraph 28 accurately quotes certain portions
of §§ 6.2(a), (b), (c) and (d) and Appendix A from an Agreement dated May 26,
2011, with DP Technology Corp. and DP Technology Switzerland GmbH. Except as
specifically admitted, Kennametal denies the allegations and characterizations
contained in Paragraph 28.

29.    Kennametal admits that Paragraph 29 accurately quotes certain portions
of §§ 6.3 and 6.3(a) from an Agreement dated May 26, 2011, with DP Technology
Corp. and DP Technology Switzerland GmbH. Except as specifically admitted,
Kennametal denies the allegations and characterizations contained in Paragraph 29.

30.    Kennametal admits that Paragraph 30 accurately quotes certain portions
of § 6.3 from an Agreement dated May 26, 2011, with DP Technology Corp. and DP
Technology Switzerland GmbH. Except as specifically admitted, Kennametal denies
the allegations and characterizations contained in Paragraph 30.

31.    Kennametal admits that Paragraph 31 accurately quotes certain portions
of §§ 6.3 and 6.4 from an Agreement dated May 26, 2011, with DP Technology
Corp. and DP Technology Switzerland GmbH. Except as specifically admitted,
Kennametal denies the allegations and characterizations contained in Paragraph 31.

32.    Kennametal admits that Paragraph 32 accurately quotes certain portions
of § 9.2(b) from an Agreement dated May 26, 2011, with DP Technology Corp. and
DP Technology Switzerland GmbH.  Except as specifically admitted, Kennametal
denies the allegations and characterizations contained in Paragraph 32.

33.    Kennametal admits that the Agreement began in May 2011 and that

Kennametal admits it sent a notice of termination which became effective on May 25, 2025. Kennametal admits there were frequent development meetings, development records, and a collaborative OneNote document. Kennametal admits that OneNote access was restricted on Kennametal's end. Kennametal lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 33 concerning MachiningCloud's materials access protocols, and therefore denies them. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 33.

34.    Kennametal denies the allegations and characterizations in Paragraph 34.

35.    Kennametal lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 35 concerning MachiningCloud's internal development approach, and therefore denies them. Kennametal denies all other allegations and characterizations contained in Paragraph 35.

36.    Kennametal lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 36 concerning MachiningCloud's internal development approach, and therefore denies them. Kennametal denies all other allegations and characterizations contained in Paragraph 36.

37.    Kennametal lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 37 concerning MachiningCloud's internal development approach, and therefore denies them. Kennametal denies all other allegations and characterizations contained in Paragraph 37.

38.    Kennametal lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 38 concerning MachiningCloud's internal development approach, and therefore denies them. Kennametal denies all other allegations and characterizations contained in Paragraph 38.

39.    Kennametal admits that Exhibit B was shared with counsel for Kennametal on a "Highly Confidential – Attorneys' Eyes Only" basis. Kennametal

1    denies the allegations and characterizations in Paragraph 39.

2        40.    Kennametal denies the allegations and characterizations in Paragraph

3    40.

4        41.    Kennametal denies the allegations and characterization in Paragraph

5    41.

6        42.    Kennametal denies that Rule Builder is a component of the Kennametal

7    Platform. Kennametal lacks knowledge or information sufficient to form a belief as

8    to the allegations of Paragraph 42 concerning MachiningCloud's creation and use of

9    Rule Builder, and therefore denies them. Kennametal denies all other allegations and

10    characterizations contained in Paragraph 42.

11        43.    Kennametal denies the allegations and characterizations in Paragraph

12    43.

13        44.    Kennametal lacks knowledge or information sufficient to form a belief

14    as to the allegations of Paragraph 44 concerning MachiningCloud's approach to the

15    development of the Novo software, and therefore denies them. Kennametal denies all

16    other allegations and characterizations contained in Paragraph 44.

17        45.    Kennametal denies the allegations and characterizations in Paragraph

18    45.

19        46.    Kennametal denies the allegations and characterizations in Paragraph

20    46.

21        47.    Kennametal denies the allegations and characterizations in Paragraph

22    47.

23        48.    Kennametal denies the allegations and characterizations in Paragraph

24    48.

25        49.    Kennametal denies the allegations and characterizations in Paragraph

26    49.

27        50.    Kennametal denies the allegations and characterizations in Paragraph

28    50.

51.    Kennametal denies the allegations and characterizations in Paragraph 51.

52.    Kennametal admits that United States Patent No. U.S. 9,817,387 (the "'387 Patent") and United States Patent No. 10,754,322 (the "'322 Patent") are both entitled "System and Method for Selecting a Tool Assembly." Kennametal admits that the '387 Patent shows an issuance date of November 14, 2017, and a filing date of August 13, 2013. Kennametal admits that the '322 Patent shows an issuance date of August 25, 2020, and a filing date of October 11, 2017. Kennametal admits that both the '387 Patent and '322 Patent lists inventors Mitchell D. Benko, Colin John Deem, Pradeep Hemmanur, Fred Patterson, and Karen Gallentine and lists Kennametal as the assignee. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 52.

53.    Kennametal denies the allegations and characterizations in Paragraph 53.

54.    Kennametal admits that Paragraph 54 includes direct cites from the '387 Patent. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 54.

55.    Kennametal admits that Paragraph 55 includes direct cites from the '322 Patent. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 55.

56.    Kennametal lacks knowledge or information sufficient to form a belief as to the allegations and characterizations of Paragraph 56, and therefore denies them.

57.    Kennametal admits that on June 3, 2022, U.S. Patent Appl. No. 17/832,419 (the "'419 Application") was submitted to the U.S. Patent and Trademark Office. Kennametal admits that Paragraph 57 includes direct cites from the '419 Application. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 57.

58.     Kennametal denies the allegations and characterizations in Paragraph 58.

59.     Kennametal admits that Novo was commercially operational in the first quarter of 2014 and that MachiningCloud was paid $250,000 per quarter. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 59.

60.     Kennametal denies the allegations and characterizations in Paragraph 60.

61.     Kennametal denies the allegations and characterizations in Paragraph 61. Kennametal admits it represented itself as a trusted partner and ethical company and did accurately represent its sales. Kennametal denies all other allegations and characterizations in Paragraph 61.

62.     Kennametal denies the allegations and characterizations in Paragraph 62.

63.     Kennametal admits that Paragraph 63 accurately quotes certain portions of § 6.2(c) from an Agreement dated May 26, 2011, with DP Technology Corp. and DP Technology Switzerland GmbH.  Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 63.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF BREACH OF CONTRACT

#### (Against Kennametal)

64.     Kennametal incorporates by reference its responses to Paragraphs 1– 63 of the Second Amended Complaint as though set forth fully herein. Paragraph 64 of the Second Amended Complaint does not contain allegations for Kennametal to either admit or deny and so no response is required.

65.     Kennametal admits it entered into an Agreement dated May 26, 2011, with DP Technology Corp. and DP Technology Switzerland GmbH to develop a software solution known as "Novo." Except as specifically admitted, Kennametal

1    denies the allegations and characterizations contained in Paragraph 65.

2        66.    Kennametal denies the allegations and characterizations in Paragraph

3    66.

4        67.    Kennametal denies the allegations and characterizations in Paragraph

5    67.

6        68.    Kennametal denies the allegations and characterizations in Paragraph

7    68.

8        69.    Kennametal admits that Paragraph 69 accurately quotes certain portions

9    of §§ 9.4, 9.5, 9.7, 7.1, 7.2 and 7.3 from an Agreement dated May 26, 2011, with DP

10   Technology Corp. and DP Technology Switzerland GmbH. Except as specifically

11   admitted, Kennametal denies the allegations and characterizations contained in

12   Paragraph 69.

13       70.    Kennametal admits that Paragraph 70 accurately quotes certain portions

14   of §§ 2.6, 2.7, 4.5, 7.1 and 7.2 from an Agreement dated May 26, 2011, with DP

15   Technology Corp. and DP Technology Switzerland GmbH. Except as specifically

16   admitted, Kennametal denies the allegations and characterizations contained in

17   Paragraph 70 of the Complaint.

18       71.    Kennametal admits that Paragraph 71 accurately quotes certain portions

19   of §§ 6.2(a), (b), and (d) and Appendix A from an Agreement dated May 26, 2011,

20   with DP Technology Corp. and DP Technology Switzerland GmbH. Except as

21   specifically admitted, Kennametal denies the allegations and characterizations

22   contained in Paragraph 71.

23       72.    Kennametal admits that Paragraph 72 accurately quotes certain portions

24   of § 6.3 from an Agreement dated May 26, 2011, with DP Technology Corp. and DP

25   Technology Switzerland GmbH. Except as specifically admitted, Kennametal denies

26   the allegations and characterizations contained in Paragraph 72.

27       73.    Kennametal admits that Paragraph 73 accurately quotes certain portions

28   of § 6.4 from an Agreement dated May 26, 2011, with DP Technology Corp. and DP

Technology Switzerland GmbH. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 73.

74. Kennametal admits that Paragraph 74 accurately quotes certain portions of § 6.3 from an Agreement dated May 26, 2011, with DP Technology Corp. and DP Technology Switzerland GmbH. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 74.

75. Kennametal denies the allegations and characterizations in Paragraph 75.

## SECOND CLAIM FOR RELIEF
## BREACH OF IMPLIED COVENANT OF GOOD FAITH
## AND FAIR DEALING
### (Against Kennametal)

76. Kennametal incorporates by reference its responses to Paragraphs 1–75 of the Second Amended Complaint as though set forth fully herein. Paragraph 76 of the Second Amended Complaint does not contain allegations for Kennametal to either admit or deny and so no response is required.

77. Kennametal admits it entered into an Agreement dated May 26, 2011, with DP Technology Corp. and DP Technology Switzerland GmbH. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 77.

78. Kennametal denies the allegations and characterizations in Paragraph 78.

79. Kennametal denies the allegations and characterizations in Paragraph 79.

80. Kennametal denies the allegations and characterizations in Paragraph 80.

81. Kennametal admits that Paragraph 81 accurately quotes certain portions of § 6.2(c) from an Agreement dated May 26, 2011, with DP Technology Corp. and

DP Technology Switzerland GmbH. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 81.

82.    Kennametal denies the allegations and characterizations in Paragraph 82.

83.    Kennametal denies the allegations and characterizations in Paragraph 83.

84.    Kennametal denies the allegations and characterizations in Paragraph 84.

## THIRD CLAIM FOR RELIEF

## VIOLATION OF DEFEND TRADE SECRETS ACT 18 U.S.C. § 1836 ET SEQ

### (Against Kennametal)

85.    Kennametal incorporates by reference its responses to Paragraphs 1–84 of the Second Amended Complaint as though set forth fully herein. Paragraph 85 of the Second Amended Complaint does not contain allegations for Kennametal to either admit or deny and so no response is required.

86.    Kennametal denies the allegations and characterizations in Paragraph 86.

87.    Kennametal denies the allegations and characterizations in Paragraph 87.

88.    Kennametal denies the allegations and characterizations in Paragraph 88.

89.    Kennametal denies the allegations and characterizations in Paragraph 89.

90.    Kennametal denies the allegations and characterizations in Paragraph 90.

91.    Kennametal denies the allegations and characterizations in Paragraph 91.

92.    Kennametal denies the allegations and characterizations in Paragraph

92.

## **FOURTH CLAIM FOR RELIEF**

## **VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT**

### **(Against Kennametal)**

93.     Kennametal incorporates by reference its responses to Paragraphs 1–92 of the Second Amended Complaint as though set forth fully herein. Paragraph 93 of the Second Amended Complaint does not contain allegations for Kennametal to either admit or deny and so no response is required.

94.     Kennametal denies the allegations and characterizations in Paragraph 94.

95.     Kennametal denies the allegations and characterizations in Paragraph 95.

96.     Kennametal denies the allegations and characterizations in Paragraph 96.

97.     Kennametal denies the allegations and characterizations in Paragraph 97.

98.     Kennametal denies the allegations and characterizations in Paragraph 98.

99.     Kennametal denies the allegations and characterizations in Paragraph 99.

## **FIFTH CLAIM FOR RELIEF**

## **ACCOUNTING**

### **(Against Kennametal)**

100.   Kennametal incorporates by reference its responses to Paragraphs 1–99 of the Second Amended Complaint as though set forth fully herein. Paragraph 100 of the Second Amended Complaint does not contain allegations for Kennametal to either admit or deny and so no response is required.

101.   Kennametal admits that the Agreement dated May 26, 2011, with DP

Technology Corp. and DP Technology Switzerland GmbH states that "Kennametal shall provide DP Technology with an accounting of all sales subject hereto along with the quarterly payment." Agreement. § 6.3. Except as specifically admitted, Kennametal denies the allegations and characterizations contained in Paragraph 101.

102.   Kennametal admits that it received a non-specific audit request from MachiningCloud and responded by providing sales data "made by or through the use of" Novo. Kennametal denies the remaining allegations and characterizations in Paragraph 102.

103.   Kennametal denies the allegations and characterizations in Paragraph 103.

## SIXTH CLAIM FOR RELIEF

## DECLARATORY RELIEF – CORRECTION OF INVENTORSHIP UNDER 35 U.S.C. § 256(B)

### (Against Kennametal)

104.   Kennametal incorporates by reference its responses to Paragraphs 1-103 of the Second Amended Complaint as though set forth fully herein. Paragraph 104 of the Second Amended Complaint does not contain allegations for Kennametal to either admit or deny and so no response is required.

105.   Kennametal admits that this is a claim for correction of inventorship pursuant to 35 U.S.C § 256(b).

106.   Kennametal admits that it is the owner of the '387 and '322 Patents and that Mitchell D. Benko, Colin John Deem, Pradeep Hemmanur, Fred Patterson, and Karen Gallentine are the listed inventors for both the '387 and '322 Patents.

107.   Kennametal denies the allegations and characterizations in Paragraph 107.

108.   Kennametal denies the allegations and characterizations in Paragraph 108.

109.   Kennametal denies the allegations and characterizations in Paragraph

109.

110.   Kennametal denies the allegations and characterizations in Paragraph 110.

## SIXTH [sic] CLAIM FOR RELIEF

## DECLARATORY RELIEF – NON-INFRINGEMENT OF PATENTS

### (Against Kennametal)

111.   Kennametal incorporates by reference its responses to Paragraphs 1-110 of the Second Amended Complaint as though set forth fully herein. Paragraph 111 of the Second Amended Complaint does not contain allegations for Kennametal to either admit or deny and so no response is required.

112.   Kennametal denies the allegations and characterizations in Paragraph 112.

113.   Kennametal admits that it has asserted that MachiningCloud infringes the '387 and '322 Patents and denies the remaining allegations in Paragraph 113.

114.   Kennametal denies the allegations and characterizations in Paragraph 114.

115.   Kennametal denies the allegations and characterizations in Paragraph 108.

## SIXTH [sic] CLAIM FOR RELIEF

## DECLARATORY RELIEF – NON-INFRINGEMENT [sic] OF PATENTS

### (Against Kennametal)

116.   Kennametal incorporates by reference its responses to Paragraphs 1-115 of the Second Amended Complaint as though set forth fully herein. Paragraph 116 of the Second Amended Complaint does not contain allegations for Kennametal to either admit or deny and so no response is required.

117.   Kennametal denies the allegations and characterizations in Paragraph 117.

118.   Kennametal denies the allegations and characterizations in Paragraph

118.

119.   Kennametal admits that it has asserted that MachiningCloud infringes the '387 and '322 Patents and denies the remaining allegations in Paragraph 119.

120.   Kennametal denies the allegations and characterizations in Paragraph 120.

## PRAYER FOR RELIEF

The Prayer for Relief requires no response. To the extent any response is required, Kennametal denies that MachiningCloud is entitled to any of the relief requested.

## GENERAL DENIAL

To the extent any allegations in the Second Amended Complaint are not specifically admitted, Kennametal denies them.

## AFFIRMATIVE AND OTHER DEFENSES

Subject to the responses above, Kennametal alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. In addition to the defenses described below, subject to its responses above, Kennametal reserves the right to modify, amend, and/or expand upon these defenses as discovery proceeds, and to allege additional defenses that become known through the course of discovery.

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

1.   The Second Amended Complaint, and all its causes of action, fail to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE
### (Equitable Doctrines)

2.   The Second Amended Complaint, and all its causes of action, are barred by the equitable doctrines of consent, waiver, estoppel, laches, and/or unclean

hands.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to State a Claim – Trade Secrets)

3.    The Second Amended Complaint, and all its causes of action, fail to state facts sufficient to establish the existence of a trade secret under California and Federal law.

## FOURTH AFFIRMATIVE DEFENSE

### (Failure to Maintain Secrecy – Trade Secrets)

4.    The Second Amended Complaint, and all its causes of action, fail to state facts sufficient to establish that reasonable measures were taken to maintain secrecy of the purported trade secret.

## FIFTH AFFIRMATIVE DEFENSE

### (Independent Development – Trade Secrets)

5.    The Second Amended Complaint, and all its causes of action, are barred because the information allegedly constituting the misappropriated trade secrets was independently developed by Kennametal.

## SIXTH AFFIRMATIVE DEFENSE

### (Information in the Public Domain – Trade Secrets)

6.    The Second Amended Complaint, and all its causes of action, are barred because the information allegedly constituting the misappropriated trade secrets was readily ascertainable to others in the industry.

## SEVENTH AFFIRMATIVE DEFENSE

### (Recovery of Attorney Fees – Cal. Civ. Code § 3426.4)

7.    Defendant may, at the Court's discretion, be entitled to recover from Plaintiffs its reasonable attorneys' fees and costs of suit herein based on Plaintiffs' bad faith claim of trade secret misappropriation pursuant to California Civil Code section § 3426.4.

## EIGHTH AFFIRMATIVE DEFENSE

**(Statute of Limitations)**

8.      The Second Amended Complaint, and all its causes of action, are barred by any applicable statutes of limitation.

**NINTH AFFIRMATIVE DEFENSE**

**(Failure to State a Claim – Improper Inventorship)**

9.      The Second Amended Complaint, and all its causes of action, fail to state a claim for improper inventorship upon which relief can be granted.

**RESERVATION OF ADDITIONAL DEFENSES**

Kennametal reserves the right to assert additional defenses that become apparent during discovery.

**COUNTERCLAIMS**

Defendant and Counterclaim Plaintiff Kennametal Inc. ("Kennametal"), for its Counterclaims against Plaintiffs and Counterclaim Defendants MachiningCloud, Inc., and Machining Cloud GMBH (collectively "MachiningCloud"), alleges the following:

**NATURE OF THE ACTION**

1.      Kennametal is a global leader in metal cutting and wear-resistant solutions, serving industries such as aerospace, automotive, energy, and general engineering. Kennametal's tools are designed to enable consumers to cut through tough materials, like a variety of metals, with greater precision and speed. For example, the tools Kennametal develops are the sharp, super-durable blades and drill bits used in factories and workshops to create parts for cars, airplanes, and other products.

2.      Kennametal has approximately 8,700 employees across 39 different countries. Kennametal maintains over 1,800 active patents worldwide, with at least 125 of those patents granted just in 2024. Kennametal also launched over 20 new innovative products in 2024 and achieves over $2 billion in annual revenue.

3.      Given the complexities of its work in various industries, Kennametal's product suite is large and includes a variety of different tooling parts which are not all compatible with one another.

4.      Kennametal sought to create a software platform that would further automate the selection and shopping process for its customers, where they could virtually compile and purchase tooling assemblies comprised of compatible tool parts. Previously, customers wishing to purchase tools would review Kennametal's paper and online catalogues and cross-reference each component of a system to ensure they were compatible, or they would engage Kennametal specialists who could utilize Kennametal's internal tools such as digital formulas and calculators, to create compatible tool assemblies.

5.      In May 2011, Kennametal entered into an agreement ("Agreement," attached hereto as Exhibit 1) with DP Technology Corp. and DP Technology Switzerland GmbH, a software vendor and the predecessor to MachiningCloud, for the development and maintenance of such a software platform.

6.      On information and belief, MachiningCloud has approximately 21 employees and achieves $2 million in annual revenue, and is not a manufacturer of tools or physical products of any kind.

7.      The Agreement includes confidentiality provisions where, *inter alia*, each party agreed to "use the other party's Confidential Information solely for the purposes of [the Agreement]" and specifically "not to use or exploit any of the other party's Confidential Information directly or indirectly for its own benefit…." (Agreement, § 9.5).

8.      With these contractual protections, among others, Kennametal permitted MachiningCloud access to a range of Kennametal's Trade Secrets, including (a) Kennametal's confidential customer list, (b) the proprietary rules and logic used to categorize each tool attribute in Kennametal's entire product suite to ensure compatibility with other tooling parts, (c) proprietary tooling algorithms, schematics,

and equations related to tool-path planning, tool selection, and assembly configuration, (d) nonpublic lists or databases of each and every tooling geometry, materials, technical specifications, and performance characteristics of each product component offered by Kennametal, (e) real-world performance data and customer feedback used to fine-tune compatibility and assembly plans, and (f) other deep industry experience and engineering know-how that provides best practices and insight for unique and optimal implementation of Kennametal's products into the software. These Trade Secrets also constituted Kennametal's protected "Confidential Information" under Agreement § 9.2.

9.    Following years of development and collaboration between MachiningCloud and Kennametal, the software program, marketed as "Novo," was launched in November 2013. Novo has enabled Kennametal consumers to easily browse and purchase cutting tools with access to Kennametal's wealth of knowledge regarding tool compatibilities and assemblies based upon its decades of experience and industry know-how. Additionally, Novo users are able to save their data, including tool lists, jobs, and assemblies that they build on their Novo profile.

10.    Under the Agreement, MachiningCloud provided ongoing technical support and software maintenance for Novo following commercialization. (Agreement Appendix A, at 17). By virtue of these contractual obligations, and in addition to the other Trade Secrets and/or Confidential Information identified above, MachiningCloud also had access to the list of Kennametal customers with Novo accounts, including those customers' contact information, purchase history, browsing and assembly history, and other related data.

11.    Kennametal's Trade Secrets and/or Confidential Information are the backbone of Novo: the platform operates on a rules-based logic system derived from Kennametal's Trade Secrets and/or Confidential Information and extensive expertise in the machining industry. Novo collects and analyzes critical parameters such as the workpiece material, machining operation type, machine capabilities, and desired

outcomes like surface finish and tolerance. Based on this information, it then filters tooling options for the customer to provide only those that meet the specific technical requirements of the customer's project.

12.    The Agreement between the parties recognized that "MachiningCloud is not a work-for-hire," and contemplated that MachiningCloud would retain all "rights, title, and ownership of the software, source code, algorithms, processes, methods, or other inventions" that MachiningCloud developed while creating this bespoke software program. (Agreement § 7.1). MachiningCloud was also free to offer its software to other companies, including Kennametal's competitors. (Agreement § 4.5). MachiningCloud ultimately did so in or around 2013, creating a separate version of the software called the MachiningCloud Platform that incorporated not only Kennametal's product catalog, but the product catalogs of over sixty of Kennametal's competitors. *However*, Kennametal was to be the sole provider of the vital rules and logic incorporated into the innovative selection functionality of the software (the "Tool Advisor")—whether on Novo or the MachiningCloud Platform—for the first three years following commercialization of Novo (the "Exclusivity Period"). (Agreement § 4.6).

13.    Furthermore, MachiningCloud was only entitled to access and utilize Kennametal's Trade Secrets and/or Confidential Information for the duration of the Agreement, and only for purposes permitted under the Agreement. Following termination, Kennametal was entitled to request the return or destruction of its Confidential Information. (Agreement § 9.11). This meant that, even if MachiningCloud created another platform for the software (which it did), that version of the software was not permitted to incorporate Kennametal's Trade Secrets and/or Confidential Information following termination of the Agreement.

14.    In late 2019, Kennametal began development of an update to its website to include features related to the virtual building and procuring of cutting tools (the "Kennametal Platform"). The main purpose of updating the Kennametal Platform

was to consolidate Kennametal's various customer applications, and allow
Kennametal customers to create more comprehensive machining solutions for their
projects, including and expanding upon the tool assemblies they could create in
Novo. Kennametal used some of the same proprietary technical information it
owns—and provided to MachiningCloud for Novo's development—in the update to
its own Kennametal Platform.

15.    On February 5, 2025, MachiningCloud filed suit against Kennametal,
and on April 18, 2025, MachiningCloud filed its First Amended Complaint, primarily
claiming that Kennametal has misappropriated MachiningCloud's confidential
information and trade secrets by incorporating elements of the Novo platform into the
Kennametal Platform. In making its allegations in the lawsuit, MachiningCloud
omitted the fact that the features Kennametal has incorporated from Novo into the
Kennametal Platform are simply Kennametal's own proprietary technical information
– the same Trade Secrets and other confidential information that Kennametal shared
(non-exclusively) with MachiningCloud under the Agreement. Kennametal never had
access to MachiningCloud's source code, and it built the Kennametal Platform with
other development partners from the ground up.

16.    Following the filing of MachiningCloud's meritless lawsuit, Kennametal
communicated to MachiningCloud its intent to terminate the Agreement on February
24, 2025, effective May 26, 2025, pursuant to Agreement § 5.2(c), which requires 90-
day notice prior to termination.

17.    In its termination letter, Kennametal directed MachiningCloud to
"promptly return, or certify the destruction of, all Confidential Information received
from" Kennametal, as required under Agreement § 9.11. However, given the pending
litigation MachiningCloud had commenced, Kennametal also instructed
MachiningCloud not to "destroy or delete any relevant information and evidence"
and instead provide the documents and information to counsel for preservation.

18.     Kennametal also demanded MachiningCloud cease and desist further use of Kennametal Confidential Information, including the use of Kennametal's Trade Secrets which are incorporated into the MachiningCloud Platform and any other Confidential Information they have received from Kennametal. MachiningCloud provided no response to Kennametal's termination letter.

19.     Because Kennametal's Confidential Information, such as the rules and logic needed to power Novo, must be deleted following termination of the Agreement, Novo will no longer be of use to Kennametal's customers following the Agreement's termination. Thus, in expectation of the termination of the Agreement, Kennametal has directed its customers, including through use of Kennametal's confidential customer list (which itself is a Kennametal Trade Secret), to the Kennametal Platform.

20.     However, on March 25, 2025, Kennametal became aware of a marketing and public relations campaign launched by MachiningCloud and directed to Novo users attempting to steer Kennametal's customers to use the MachiningCloud Platform instead of Novo.

21.     On information and belief, MachiningCloud has sent multiple mass communications to a list of all Kennametal customers with Novo accounts, soliciting them to transfer to the MachiningCloud Platform. As noted above, this Kennametal customer list is a Trade Secret and/or Confidential Information that MachiningCloud has access to solely through its contractual relationship with Kennametal. As shown below, MachiningCloud misused this Trade Secret and/or Confidential Information in an attempt to persuade current Kennametal customers who use Novo to migrate to the MachiningCloud Platform so that MachiningCloud retained access to those customers when the Agreement fully terminated on May 26, 2025.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



Dear ,

Effective May 25, 2025, MachiningCloud will discontinue support of the Novo platform. We are
committed to providing you with a seamless transition and are offering all existing Novo customers,
registered as of March 24, 2025, a complimentary subscription to the MachiningCloud platform.
Your existing Novo credentials will remain valid on the MachiningCloud platform. Upon logging
in, you will find all your saved data, including tool lists, jobs, assemblies, and other relevant infor-
mation, readily accessible.

With MachiningCloud, you will get the following:

- Access to a comprehensive selection of tools from more than 60 leading manufac-
  turers.
- An intuitive and efficient user interface for streamlined tooling management.
- Advanced features for calculating feeds and speeds based on material types.
- AI-powered tool selection tools to optimize your manufacturing processes.
- Unparalleled data access and solutions to drive innovation and success.

MachiningCloud is dedicated to providing support throughout this process. For any inquiries or
assistance, please contact Matthew Nicholson, Director of Sales and Marketing, at matthew.nichol-
son@machiningcloud.com.

We appreciate your continued support and look forward to serving you on the MachiningCloud
platform.

Sincerely,

MachiningCloud Team

16
17
18
19
20
21
22
23
24
25
26
27
28

22.     This communication further makes clear that MachiningCloud is
offering Novo customers access to their "saved data, including tool lists, jobs,
assemblies, and other relevant information" created and stored in Novo once they
have migrated to the MachiningCloud Platform, even following termination of the
Agreement. The duplication in the MachiningCloud Platform of Novo's offerings and
services based on Kennametal's Trade Secrets and/or Confidential Information
following termination is a blatant violation of the Agreement, and a misuse of
Kennametal's Confidential Information and Trade Secrets. It is Kennametal's
confidential rules and logic which automate the entire process of picking between
cutting tools in order to create a cutting assembly in Novo. The data MachiningCloud
is promising to provide in the MachiningCloud Platform following termination of the
Agreement is derived from Kennametal's Trade Secrets and/or Confidential

Information, including the output of searches, saved projects and assemblies, and browsing history that Novo users generate with Kennametal's rules and logic.

23.     Kennametal sent another letter to MachiningCloud on April 3, 2025 to demand that MachiningCloud: (1) cease and desist all marketing and public statements regarding their offer to Kennametal customers to use the MachiningCloud Platform; (2) affirmatively retract the statements already made in the marketing communications sent to all Novo users and; (3) stop all migration of Novo users onto the MachiningCloud Platform.

24.     MachiningCloud responded on April 9, 2025, claiming that it is entitled through its "direct contractual privity" with Novo users to make communications for "the purpose of (a) providing services in connection with Novo, and (b) providing other services reasonably anticipated within the context of MachiningCloud's relationship with its user/customers." But this messaging is just the opposite of "providing services in connection with Novo"—it is announcing MachiningCloud is "*discontinuing* support from the Novo platform." (emphasis added). And communications to Novo users soliciting them to take their business to MachiningCloud's competitive platform is hardly a service "reasonably anticipated" within MachiningCloud's current, limited "relationship" with Novo customers, which only exists by virtue of MachiningCloud's Agreement with Kennametal.

25.     MachiningCloud has continued to send solicitations to Novo users that are a direct threat not only to Kennametal's Trade Secrets and/or Confidential Information, brand, and reputation, but also an intentional interference with its economic relationships with those customers.

26.     MachiningCloud also stated in its April 9, 2025 correspondence that "when the Agreement is terminated, MachiningCloud will delete the Rules, except as necessary to maintain records for this litigation." However, the "Rules" are only one aspect of the substantial provision of Trade Secrets and/or Confidential Information that Kennametal disclosed to MachiningCloud pursuant to the Agreement. And,

MachiningCloud's promise to "delete the Rules" is contradicted by its
communication to Novo users that their "saved data, including tool lists, jobs,
assemblies, and other relevant information" – which necessarily depends on
Kennametal's proprietary rules and logic – will be available going forward on the
MachiningCloud Platform. MachiningCloud has further failed to confirm that it will
delete and/or stop communications to Kennametal's customer list, which is a Trade
Secret and/or Confidential Information belonging to Kennametal, that
MachiningCloud has access to solely through its contractual relationship with
Kennametal.

27.     The MachiningCloud Platform also infringes, and will infringe upon
termination of the Agreement, certain of Kennametal's patents. It utilizes methods
and systems (discussed further below in Paragraphs 83–98) invented by Kennametal
that enhance consumers' ability to select compatible cutting tools and virtually
prepare tooling assemblies based on sophisticated rules about the connection and
compatibility between different elements. And it applies those methods and systems
to product suites from over sixty different Kennametal competitors. Using
Kennametal's technology, the MachiningCloud Platform allows the user to quickly
and accurately create a final assembly that will properly function according to
specific requirements for that assembly.

28.     Kennametal now brings these counterclaims based on MachiningCloud's
(1) patent infringement of United States Patent No. U.S. 9,817,387 (the "'387
Patent") and United States Patent No. 10,754,322 (the "'322 Patent") (collectively,
the "Patents-in-Suit"); (2) MachiningCloud's willful misappropriation of
Kennametal's Trade Secrets under federal and state law; (3) breach of the parties'
Agreement; (4) intentional interference with economic relations; and (5) unfair
competition.

1

## THE PARTIES

2      29.    Kennametal is a corporation with a principal place of business at 525

3  William Penn Place Suite 3300, Pittsburgh, PA 15219.

4      30.    On information and belief, MachiningCloud, Inc. is a corporation with

5  its principal office located in this District, specifically within Ventura County,

6  California at 1130 Avenida Acaso, Camarillo, CA 93012.

7      31.    On information and belief, Machining Cloud GmbH is a foreign

8  corporation organized and existing under the laws of Switzerland with a principal

9  place of business at Hansmatt 32, 6370 Stans, Switzerland.

10      32.    MachiningCloud, Inc. and Machining Cloud GmbH have acted in

11  concert with respect to the facts alleged herein such that any act of MachiningCloud,

12  Inc. is attributable to Machining Cloud GmbH, and vice versa.

13

## JURISDICTION AND VENUE

14      33.    Kennametal brings these Counterclaims in part for patent infringement

15  against MachiningCloud under the Patent Laws of the United States, 35 U.S.C. § 1 *et.*

16  *seq.*, including 35 U.S.C. §§ 271, 281–285 and for actions arising under the federal

17  Defend Trade Secrets Act, 18 U.S.C. § 1836 *et. seq.*

18      34.    This Court has subject matter jurisdiction over these Counterclaims

19  pursuant to 28 U.S.C. §§ 1331 and 1338 and has supplemental jurisdiction over

20  Kennametal's state-law causes of action pleaded below pursuant to 28 U.S.C. § 1367.

21  Additionally, the Court has subject matter jurisdiction over Kennametal's state-law

22  causes of action under 28 U.S.C. § 1332 because the amount in controversy exceeds

23  the $75,000 threshold and there is complete diversity of citizenship because the

24  Plaintiffs are citizens of California and Switzerland and Defendant is a citizen of

25  Pennsylvania.

26      35.    This Court has personal jurisdiction over MachiningCloud, Inc. because

27  it maintains its principal place of business in this District and engages in continuous

28

and systematic business activities within this District including through its infringing activity.

36.    This Court has personal jurisdiction over Machining Cloud Gmbh in this action because it has committed and continues to commit acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over each would not offend traditional notions of fair play and substantial justice, including but not limited to by filing this action. MachiningCloud Gmbh, directly and through subsidiaries or intermediaries, has committed and continues to commit acts of infringement in this District, by among other things, making, using, importing, offering to sell and selling its MachiningCloud Platform, that infringes the Patents-in-Suit and by misappropriating Kennametal's Trade Secrets and/or Confidential Information in breach of the parties' Agreement.

37.    Venue is proper in this District pursuant to at least 28 U.S.C. § 1400(b) for the patent infringement claims and 28 U.S.C. § 1391 for all other claims because MachiningCloud Inc. maintains its principal place of business in this District, resides in this district, and has committed acts of patent infringement in this District.

38.    Machining Cloud GmbH is not a resident of the United States and may be sued in this District because suits for patent infringement against foreign entities are proper in any judicial district where they are subject to personal jurisdiction.

## BACKGROUND

### Kennametal and Its Trade Secrets

39.    Founded in 1938 and headquartered in Pittsburgh, Pennsylvania, Kennametal specializes in tungsten carbide tooling, high-performance cutting systems, and advanced cutting materials. With operations in over 60 countries, Kennametal provides innovative solutions to enhance productivity and precision in manufacturing.

40.    Kennametal has maintained a strong commitment to research and development of technological advancements in industrial tooling. This has resulted in a comprehensive suite of cutting tools tailored to a variety of industries, along with associated technology and logic that streamline pairing compatibilities across all Kennametal product lines.

41.    Kennametal's product suite and associated data and technology constitute a holistic intellectual property portfolio, which includes the Patents-in-Suit and Trade Secrets and/or Confidential Information which are the result of its research and development, engineering, and labor efforts over many years, including efforts independent of and well before Kennametal's work to develop Novo.

42.    Kennametal's Trade Secrets and/or Confidential Information include the following, which were shared with MachiningCloud and are embedded in the foundation of the Novo platform's utility and service:

    a.    Kennametal's nonpublic list of customers who have created accounts on Novo and use Novo to browse and purchase Kennametal products, as well as those customers' contact information, browsing or purchase history, and related data generated and stored on Novo;

    b.    Rules and logic for selection and assembly of Kennametal tooling products that ensure compatibility and ideal operation between thousands of different products, all of which come in vast numbers of different sizes, shapes, and styles, and are used for a variety of different cutting applications, such as milling, holemaking, turning, and threading, based on years of continued, highly confidential engineering efforts and deep industry know-how, which goes well beyond standardized industry interface codes;

    c.    Proprietary tooling algorithms and equations related to tool-path planning, tool selection, and assembly configuration which show users multiple strategies for machining a feature, and then show users

the necessary sequence of operations to machine that feature,
accounting for real-world factors and considerations such as
dimensional tolerance, stack-up calculations regarding different
assemblies, mechanical stress modeling, cutting force, and power
consumption;

d.  Lists or databases of each and every tooling geometry, materials, and
performance characteristics of each product component offered by
Kennametal, much of which is not publicly available, that can assist
with 3D modeling and include associated metadata for each tooling
component;

e.  Real-world performance data collected from customer use and
internal testing of each tooling component and assemblies that are
used to fine-tune product compatibility parameters and provide three-
dimensional product models to users; and

f.  Confidential "trial and error," know-how information, best practices,
and other insights for the unique and optimal implementation of
Kennametal technology into the software platform, based on years of
experience and research and development in the machining industry.

((a)–(f) collectively, "Kennametal's Trade Secrets," which also
qualify as Confidential Information under the Agreement).

43.  Kennametal's Trade Secrets and/or Confidential Information are the
single driving factor behind the success of Novo.

44.  Kennametal's Trade Secrets and/or Confidential Information derive
economic value by not being readily accessible and allowing Kennametal to maintain
a competitive advantage over business competitors who do not possess similar
technologies.

/ / /

/ / /

## **Kennametal's Trade Secret Protection Efforts and Protocols**

45.    Kennametal has implemented robust protocols to protect its Trade Secrets and/or Confidential Information from improper disclosure.

46.    The Kennametal **Code of Conduct** provides an overview of the Company's policies to protect its Confidential and Proprietary Information:

> a. "Confidential and proprietary information is an important Company asset and includes any sensitive or material information that is not generally known to the public or is protected from disclosure by law… [i]f you have access to, or knowledge of any Kennametal confidential and proprietary information, even if it is not part of your job, *you have a duty and responsibility to safeguard this information* from disclosure and not share it with anyone outside of our Company or with anyone within Kennametal that doesn't have a need to know." It further states that "[e]xamples of confidential information may include business and marketing plans, customer and third party data, financial information and planned merger and acquisition information that is not generally known or released to the public or outside parties."

> b. The Code of Conduct also states that "[o]ur intellectual property (IP) is a valuable asset and includes, but is not limited to, our ideas, innovations, patents, copyrights, trademarks and trade secrets, that enable us to deliver the products and services that our customers rely on now, and in the future."

47.    Training on the Code of Conduct occurs for all employees during onboarding and yearly thereafter.

48.    Kennametal also has a **Trade Secret Protection Policy**, available to all employees on Kennametal's internal SharePoint Site, which "educate[s] each

employee regarding the significance of trade secrets and their role in protecting them." This Policy includes the following definitions and protection strategies:

    a.  Definitions:

        i.  "Technical trade secrets - these trade secrets include research & development plans and strategies, product drawings, reports and analysis, unpublished patent applications, new product concepts and projects, secret formulas, designs, computer passwords and source code, manufacturing tools and processes."

        ii.  "Business trade secrets - these trade secrets include marketing, sales, and financial and administrative data used to manage a business. Examples of business trade secrets include customer lists, product pricing plans and strategies, marketing plans, financial and accounting data, vendor data and information about employees."

    b.  Protection Strategies:

        i.  "Compartmentalize. Minimize the number of employees to whom disclosure of trade secrets is made and/or restrict the disclosure of trade secrets on a need-to-know basis."

        ii.  "Segregate the Knowledge. Where practicable, trade secrets such as a formula or manufacturing process should be divided into components that can be disclosed to different employees or groups of employees, thereby avoiding the necessity of a single employee having knowledge of the entire trade secret. Minimize the number of employees to whom disclosure of trade secrets is made and restrict the disclosure of trade secrets on a need-to-know basis."

        iii.  "Agreement. In order to obtain the full benefit of a trade secret, Kennametal must sometimes disclose trade secrets to suppliers,

subcontractors, vendors, or other third parties. As with employees, it is essential that third parties sign appropriate contracts prohibiting the use of the trade secrets beyond the permitted use."

iv. "Vendors and Customers. The identity of vendors and customers having access to a company's trade secrets should be kept secret, in order to minimize the likelihood that a competitor will attempt to learn the trade secrets from them. Moreover, vendors should be instructed to deliver sensitive components or ingredients in coded containers, to a protected destination within the company."

v. "Confidentiality Agreements. Kennametal has a standard 'outbound' confidentiality agreement for use when it is releasing its trade secrets[.]"

vi. "Internal Access. Access to areas where trade secrets are developed, used, or stored must be restricted.…Sensitive areas should be separately locked, with access made available only to a small number of responsible employees who have a need to be in the area. Metal detectors or other theft prevention systems should be considered as appropriate. Restricted Access signs should be posted in sensitive areas. Employees allowed in such areas should wear special identification badges."

vii. "Authentication. A reliable authentication system such as a userid/password system must be used to properly authenticate computer users. The system should include features that require strong passwords and password changes on a regular basis."

viii. "Internal Security. Separate the location of documents containing trade secrets from those documents not containing

trade secrets. Documents containing trade secrets may be kept under lock-and-key. For example, such documents could be secured in a central location, monitored by a responsible employee, and released only on a need-to-know basis."

ix. "Marking and Legends. All documents that contain trade secrets should contain a preprinted confidentiality legend 'CONFIDENTIAL,' notifying the reader that the document contains trade secrets."

x. "Technical Documents. All blueprints, manufacturing sheets, and other technical documents that reveal design techniques, formulas, or know-how must carry restrictive markings. For example, all documents must be stamped with a legend such as 'CONFIDENTIAL.'"

49.    Kennametal's Trade Secrets and/or Confidential Information and associated documents and development information are all password protected and are only accessible to Kennametal personnel based on need.

50.    Upon employment, Kennametal requires employees to agree to hold and safeguard Kennametal Confidential Information, both during and subsequent to employment. Upon leaving employment, Kennametal conducts exit interviews, where employees are reminded of their obligations of secrecy and non-use of any Kennametal Trade Secrets and/or Confidential Information.

51.    Kennametal customer lists, including the list of Novo user accounts are accessible only to Kennametal sales professionals and a few other Kennametal employees on a limited basis. Customer lists generated or existing on Kennametal's platforms, such as Novo, may also be accessible to or retained by Kennametal's partners or vendors. Such partners or vendors are subject to stringent confidentiality agreements, and necessary access and use restrictions.

**The Agreement Between Kennametal and MachiningCloud**

52.    In May 2011, Kennametal and MachiningCloud entered into the Agreement for the development of a bespoke software solution which would enable Kennametal consumers to browse and select cutting tools, prepare tool assemblies, and purchase tools from Kennametal's extensive suite of machining products.

53.    The provision of Kennametal's Trade Secrets and/or Confidential Information to MachiningCloud was foundational to the parties' Agreement and the development of Novo.

54.    The Agreement defines the data underlying Novo as "Beyond Machining Data" which is "Kennametal DIGITAL PRODUCT DATA and RULES." (Agreement § 1.B). Digital Product Data is defined as "Non-confidential product information and operational information which may include one or more of the following: graphical and/or descriptive information for, but not limited to, cutting tool items, assemblies and/or components." (Agreement § 1.H). Rules are defined as "Confidential digital data, behavioral data and operational information that represents the set of instructions used by the TOOL ADVISOR." (Agreement § 1.J).

55.    The "TOOL ADVISOR" is a key element of Novo dependent on Kennametal's Trade Secrets. It is defined in the Agreement as the "functionality within the SOFTWARE APPLICATION that uses RULES to provide consumers with a semi-automatic, rules-based method for cutting tool selection based upon a scientific workpiece, its features with associated properties." (Agreement § 1.M). The Agreement recognized that "Kennametal is solely responsible to develop, prepare, and upload its RULES as part of its BEYOND MACHINING DATA" and "Kennametal acknowledges that without the RULES, the TOOL ADVISOR will not function." (Agreement § 3.4).

56.    Thus, pursuant to the Agreement, in and around 2012, Kennametal shared vast amounts of confidential Kennametal data with MachiningCloud through meetings and a shared OneNote platform, comprising Kennametal's proprietary logic

and many thousands of rules, for thousands of different types of highly-engineered
cutting tools, all of which come in vast numbers of different sizes, shapes, and styles
for a variety of different cutting applications such as milling, holemaking, turning,
which Kennametal developed over a multi-year period pre-Novo.

57.    Confidential Information was defined in the Agreement as "information
of a proprietary, trade secret or confidential nature, disclosed pursuant to this
agreement, which may include but is not limited to drawings, technical information,
samples, devices, specifications, financial information or other intellectual property
or physical embodiments thereof, whether disclosed orally, visually, in writing or in
document form, by observation or inspection of a party's item, or facilities or by
conversation with a party's officers, directors, employees or agents." (Agreement §
9.2).[2]

58.    Specifically, "Kennametal Confidential Information includes but is not
limited to information relating to the development, manufacture and sale of tooling,
engineered components, and advanced hard and wear resistant materials."
(Agreement § 9.2(a)).

59.    Pursuant to the Agreement, the parties agreed to "take all steps necessary
to protect the Confidential Information, received from the other party, from
unauthorized use or disclosure" and "not to disclose the other party's Confidential
Information in any way or in any form to third parties without the disclosing party
receiving prior specific written authorization to do so and each party agrees to
disclose the Confidential Information only to those of its officers, directors,
employees or others under its control who have a need to know the Confidential

---

[2] The Agreement provided that "[e]ach party may disclose to the other party certain
Confidential Information for the purpose of facilitating this Agreement; however,
other than BEYOND MACHINING DATA required for the operation of
MACHINING CLOUD released by Kennametal to DP Technology, nothing in this
Agreement shall require either party to disclose any particular Confidential
Information to the other." (Agreement § 9.1).

Information to achieve the purposes of this Agreement, all of whom will be required by the party receiving the Confidential Information to protect it in accordance with this Agreement." (Agreement § 9.4).

60.    Each party further agreed "to use the other party's Confidential Information solely for the purposes of this Agreement" and "not to use or exploit any of the other party's Confidential Information directly or indirectly for its own benefit or for the benefit of any third party in a manner inconsistent with such purposes." (Agreement § 9.5). The parties also agreed "not to copy, duplicate, reproduce or transcribe the other party's Confidential Information, except as may be necessary for the purposes of this Agreement." (Agreement § 9.7).

61.    The Agreement also expressly recognized that "[i]nformation that is an assembly or a combination of multiple pieces of information shall not be deemed to be in the public domain or known to the receiving party merely because the individual pieces of information are separately found to be in the public domain or are known to the receiving party." (Agreement § 9.8). None of the Trade Secrets and/or Confidential Information Kennametal shared with MachiningCloud fell within the carve-outs listed in Agreement § 9.8(a)–(e).

62.    Finally, the provisions of the Agreement governing the confidentiality and use of Confidential Information survive termination of the Agreement for a period of five (5) years. And, "[u]pon the written request of the disclosing party, the receiving party will promptly return, or certify the destruction of, all Confidential Information received from the disclosing party hereunder, including copies made by the receiving party[.]" (Agreement § 9.11).

63.    Novo was launched in November 2013.

64.    In late 2019, Kennametal began development of an update to the Kennametal Platform for its customers which consolidated the services and capabilities Kennametal was offering across numerous platforms into a single user experience. Kennametal used the same proprietary technical information it owns—

1  and provided to MachiningCloud for Novo's development—in the development of

2  the Kennametal Platform.

3       65.    On February 5, 2025, MachiningCloud filed suit against Kennametal,

4  and on April 18, 2025, MachiningCloud filed its First Amended Complaint, alleging

5  that it owns as trade secrets the same Kennametal proprietary technical information

6  that Kennametal provided for use in Novo pursuant to the Agreement.

7  MachiningCloud brought claims for (1) breach of contract; (2) breach of implied

8  covenant of good faith and fair dealing; (3) violation of California Uniform Trade

9  Secrets Act; and (4) accounting.

10       66.    On February 24, 2025, Kennametal communicated its intent to terminate

11  the Agreement, effective May 26, 2025, under Section 5.2(c) which requires 90-day

12  notice prior to termination. Kennametal also directed MachiningCloud to "promptly

13  return, or certify the destruction of, all Confidential Information received from

14  Kennametal pursuant to Section 9.11 [of the Agreement]."

15       67.    MachiningCloud provided no response to Kennametal's termination

16  letter, and neglected to promptly return any Kennametal Confidential Information as

17  required under the Agreement.

18       68.    On March 25, 2025, Kennametal became aware of MachiningCloud's

19  marketing and public relations campaign to steer Kennametal customers away from

20  Novo to the MachiningCloud Platform. Specifically, on information and belief,

21  MachiningCloud sent an email communication to Kennametal's confidential

22  customer list saying the following:

23  / / /

24  / / /

25

26

27

28

**MachiningCloud**

Email not displaying correctly?
View it in your browser.

Dear ,

Effective May 25, 2025, MachiningCloud will discontinue support of the Novo platform. We are committed to providing you with a seamless transition and are offering all existing Novo customers, registered as of March 24, 2025, a complimentary subscription to the MachiningCloud platform. Your existing Novo credentials will remain valid on the MachiningCloud platform. Upon logging in, you will find all your saved data, including tool lists, jobs, assemblies, and other relevant information, readily accessible.

With MachiningCloud, you will get the following:

- Access to a comprehensive selection of tools from more than 60 leading manufacturers.
- An intuitive and efficient user interface for streamlined tooling management.
- Advanced features for calculating feeds and speeds based on material types.
- AI-powered tool selection tools to optimize your manufacturing processes.
- Unparalleled data access and solutions to drive innovation and success.

MachiningCloud is dedicated to providing support throughout this process. For any inquiries or assistance, please contact Matthew Nicholson, Director of Sales and Marketing, at matthew.nicholson@machiningcloud.com.

We appreciate your continued support and look forward to serving you on the MachiningCloud platform.

Sincerely,

MachiningCloud Team

(Exhibit 2 to Counterclaims).  The same message also appears on MachiningCloud's website.

69.     The customer list that MachiningCloud used to send this communication, which MachiningCloud only had access to by virtue of its contractual relationship with Kennametal under the Agreement, is Confidential Information and a Trade Secret belonging to Kennametal.

70.     Specifically, under the Agreement, MachiningCloud provided ongoing technical support and software maintenance for Novo following commercialization. (Agreement p. 17). By virtue of these contractual obligations, MachiningCloud had access to the list of Kennametal customers with Novo accounts, including those customers' contact information, purchase history, browsing and assembly history, and other related data.

71.     However, the mere fact that MachiningCloud could view the list of Kennametal customers using Novo and their related activity as part of its

maintenance of Novo does not grant MachiningCloud any ownership over such information. Novo users are customers of Kennametal, not MachiningCloud, and are using the Novo platform to assemble and purchase *Kennametal* products based on *Kennametal's* expert guidance and wealth of experience.

72.    MachiningCloud improperly accessed and used Kennametal's customer list in an attempt to solicit current Kennametal customers who use Novo to migrate to the MachiningCloud Platform.

73.    This communication also reveals that MachiningCloud is retaining and offering to Novo customers access to all "saved data, including tool lists, jobs, assemblies, and other relevant information" from Novo once they have migrated to the MachiningCloud Platform. Such saved data belongs to Kennametal because it is derived from Kennametal's "BEYOND MACHINING DATA" defined in the Agreement as "Kennametal DIGITAL PRODUCT DATA and RULES," which includes "confidential digital data, behavioral data and operational information that represents the set of instructions used by the TOOL ADVISOR." (Agreement §§ 1.B and 1.H).

74.    Under the terms of the Agreement, MachiningCloud does not own this information as the "[o]wnership of the SOFTWARE APPLICATION imparts no right, title or ownership in the BEYOND MACHINING DATA." (*Id*. § 2.6). The information MachiningCloud has stored and retained about each Novo user includes or is derived from the Confidential Information and Trade Secrets of Kennametal that form the basis for the Novo platform. MachiningCloud is obligated to return or destroy such information upon termination of the Agreement and request from Kennametal. (*Id*. § 9.11).

75.    MachiningCloud's ongoing utilization of Kennametal's customer list and Kennametal's Beyond Machining Data for its solicitation of Novo customers to use MachiningCloud's competing platform is therefore a breach of Agreement § 9.11, as well as § 9.5, wherein both parties agreed to use each other's Confidential

Information "solely for purposes of this Agreement" and "not to use or exploit any of the other party's Confidential Information directly or indirectly for its own benefit."

76.     MachiningCloud's offering of customer's saved data originating from the Novo platform on its competing platform has also violated Agreement § 9.7, wherein it had promised "not to copy, duplicate, reproduce or transcribe the other party's Confidential Information, except as may be necessary for the purposes this Agreement."

77.     On April 9, 2025, MachiningCloud sent another message to Novo customers to invite those customers to "see what [they're] missing" at a "MachiningCloud vs. NOVO webinar" scheduled for April 23, 2025.



(Exhibit 3 to Counterclaims).

78.    In this communication, MachiningCloud invited Novo customers to see how the MachiningCloud Platform could provide:

    a.  "Access to tooling from **63 other leading manufacturers**, all in one place

    b.  Direct **checkout with MSC Industrial Supply**

    c.  The ability to **upload [their] own tool data**

    d.  The powerful **MachiningCloud Tool Advisor** for optimized selection

    e.  **Multibrand tooling assemblies** for real-world setups

    f.  **Free Form mode** for flexible, intuitive workflows[.]"

79.    The message ended: "Whether you're curious or actively exploring better ways to manage tooling data and selection, this webinar is for you."

80.    As stated above, MachiningCloud was only able to make these improper solicitations of Kennametal's customers via its misappropriation of Kennametal's Trade Secrets and/or Confidential Information, including its nonpublic list of Novo customers.

81.    These interferences by MachiningCloud caused and will continue to cause economic harm to Kennametal. MachiningCloud's messages to Kennametal customers, who are current users of Novo and are actively browsing and shopping on Novo for exclusively Kennametal products, signal that this familiar platform will soon be disappearing and these customers should instead continue their browsing and shopping on the MachiningCloud platform, where Kennametal's products will be in competition with the products of 63 of its competitors, when Kennametal's customers are in fact still able to access Kennametal-only products and utilize Kennametal's unique expertise via the Kennametal Platform.

82.    MachiningCloud has therefore created a false sense of instability for the Novo platform, which damages Kennametal's relationships with Novo customers and Kennametal's reputation, and has enticed Novo customers to shop on its non-

exclusive platform, which is plainly a less favorable forum for Kennametal to market its products than its own exclusive platform.

**The Patents in Suit**

83.    U.S. Patent No. 9,817,387 ("the '387 Patent") is entitled "System and method for selecting a tool assembly." Mitchell D. Benko, Colin John Deem, Pradeep Hemmanur, Fred Patterson, and Karen Gallentine are identified on the face of the '387 Patent as the inventors. The '387 Patent was duly and legally issued by the USPTO on November 14, 2017, from Application No. 13/965,593, filed on August 13, 2013. The '387 Patent claims priority to Indian Patent Application No. 3043/CHE/2013, filed on July 8, 2013. A true and correct copy is attached as Exhibit 4. Kennametal is the current owner by assignment of all rights, title, and interest in and under the '387 Patent, including the right to sue and obtain damages for past, current, and future infringement.

84.    U.S. Patent No. 10,754,322 ("the '322 Patent") is entitled "System and method for selecting a tool assembly." Mitchell D. Benko, Colin John Deem, Pradeep Hemmanur, Fred Patterson, and Karen Gallentine are identified on the face of the '322 Patent as the inventors. The '322 Patent was duly and legally issued by the USPTO on August 25, 2020, from Application No. 15/730,232, filed on October 11, 2017. The '322 Patent claims priority to Indian Patent Application No. 3043/CHE/2013, filed on July 8, 2013. A true and correct copy is attached as Exhibit 5. Kennametal is the current owner by assignment of all rights, title, and interest in and under the '322 Patent, including the right to sue and obtain damages for past, current, and future infringement.

85.    Each of the claims of the '387 Patent and the '322 Patent (collectively, "the Patents-in-Suit") is presumed to be valid.

86.    The Patents-in-Suit are generally directed to systems and methods for identifying and selecting an optimized plurality of components for metal cutting tool assemblies. These cutting tool assemblies, of which there are many different types,

each feature many components, which themselves are available in a variety of different sizes and dimensions, and are deployed for various, particular cutting conditions/tasks. As such, due to the number of combinations of components, and their particular compatibility with one another, it can be extremely difficult to configure an optimum cutting tool assembly for any particular machining operation.

87.    Before the Patents-in-Suit, the methods used by those in the metal cutting industry typically included time and labor-intensive research and selection of components by a knowledgeable user, such as a specialist from a cutting tool provider such as Kennametal. Even a user with a significant amount of experience and skill would likely still only be able to make a functioning, but suboptimal tool assembly combination, as it would be extremely challenging for an individual user to consider the voluminous number of available tools and their respective features and requirements in combination.

88.    This is recognized by the Patents-in-Suit, which state, for example, "In the past, a user was required to search through and examine multiple catalogs supplied by various cutting tool manufacturers, or to search cutting tool databases, and to select a combination of cutting tool components therefrom with little or no information about the optimum operating parameters of each particular component. Such approach requires a considerable amount of time and labor and is particularly dependent on the experience and skill of the user and therefore may be unreliable and may only take into consideration a limited number of factors which may affect machining of the workpiece and efficiency of the machining operation. Furthermore, even when the tool body is of the same series, changes in its specifications also may change the cutting conditions due to the combination." '387 Patent, 1:58–2:4; *see also*, '322 Patent, 1:56–2:21.

89.    The Patents-in-Suit's invention and innovation addresses the above-described issues, and helps to ensure users are able to create a tool assembly best suited for a particular use case. For example, the Patents-in-Suit state that they seek to

1  "provide a selection system and method that enables a user to select a cutting tool

2  arrangement tailored to the user's specific equipment and particular machining

3  operation that provides fast, accurate results independent of the skill level of the

4  user." '387 Patent, 2:6–9; '322 Patent, 3:6–9. To do so, the Patents-in-Suit claim

5  novel and specific techniques for analyzing a database based on user input, and

6  providing options for optimized tool assemblies.

7         90.     The claims of the Patents-in-Suit are "carried out through the use of a

8  computing mechanism, such as, for example, without limitation, a desktop or laptop

9  computer, a handheld computing device (e.g., tablet computer, smartphone)." '387

10  Patent, 5:40–43; '322 Patent, 5:49–52. The claims of the Patents-in-Suit may further

11  require, for example, "a processing device," "an input device," and "an output

12  device." *See, e.g.*, '387 Patent, claims 12, 14, 15; '322 Patent, claims 1–16. The

13  claims of the Patents-in-Suit may also include steps that are "automatically"

14  performed. *See, e.g.,* '322 Patent, claims 1, 22. These claims thus cannot be

15  performed outside of the context of the claimed computer components on which they

16  run.

17         91.     The claims of the Patents-in-Suit are directed to methods and systems

18  that improve computer functionality by quickly and accurately tailoring a multi-

19  component cutting tool assemblies based on specific characteristics of the

20  components and their compatibility, as well as the job the tool assembly is to be used

21  for and user preferences—without requiring any particular expertise from a user,

22  which was previously not possible in the art. *See, e.g.,* '387 Patent, 1:58–2:9; '322

23  Patent, 1:56–2:21.

24         92.     The claims of the Patents-in-Suit also provide an unconventional

25  solution to the problem of creating multi-component tool assemblies. The claims of

26  the Patents-in-Suit enable determination of components for a cutting tool assembly

27  based on user input and preference, as well as characteristics of the components, to

28

1    identify a cutting tool assembly without requiring knowledge or skill from the user.

2    *See, e.g.*, '387 Patent, 2:5–31; '322 Patent, 2:17–43.

3       93.    The claims of the Patents-in-Suit are specific to a narrow area of

4    application, the innovative creation of multi-component tool assemblies based on

5    particular systems and methods for analyzing a database based on user input, and

6    providing options for optimized tool assemblies. The claims of the Patents-in-Suit

7    thus do not pre-empt others from using the particular concept of creating multi-

8    component tool assemblies.

9       94.    The claims of the '387 Patent recite more than generic computer

10   functionality and recite steps that were not purely conventional as of the priority date.

11   The claims of the '387 Patent recite at least the following elements which, either

12   alone or as an ordered combination, were unconventional and unique, and were not

13   well-known, routine, or conventional: "receiving an indication from the user of a

14   desired characteristic of at least one of the cutting tool assembly or of a workpiece to

15   be machined;" "determining that at least a portion of a first set of characteristics

16   associated with a first component of the plurality of tool components corresponds to

17   the desired characteristic;" "determining that at least a portion of a second set of

18   characteristics associated with a second component of the plurality of tool

19   components corresponds to another portion of the first set of characteristics;"

20   "grouping the first component and the second component together to form a

21   combination in response to said determining that at least a portion of the second set of

22   characteristics corresponds to another portion of the first set of characteristics;"

23   "identifying the combination to the user as the cutting tool assembly," "the portion of

24   the second set of characteristics and the other portion of the first set of characteristics

25   comprise a reference code associated, respectively, with each of the second

26   component of the plurality of tool components and the first component of the

27   plurality of tool components," "wherein matching reference codes indicate

28   compatible components," and "determining that at least a portion of the second set of

characteristics corresponds to another portion of the first set of characteristics comprises determining matching reference codes between the second component of the plurality of tool components and the first component of the plurality of tool components" ('387 Patent, Claim 1); "determining that at least a portion of a first set of characteristics associated with a first component of the plurality of tool components corresponds to the at least one desired characteristic;" determining that at least a portion of a second set of characteristics associated with a second component of the plurality of tool components corresponds to another portion of the first set of characteristics;" "grouping the first component and the second component together to form a combination in response to said determining that at least a portion of the second set of characteristics corresponds to another portion of the first set of characteristics;" "selecting the combination as the cutting tool assembly in response to said grouping;" "the portion of the second set of characteristics and the other portion of the first set of characteristics comprise a reference code associated, respectively, with each of the second component of the plurality of tool components and the first component of the plurality of tool components;" "wherein matching reference codes indicate compatible components;" "determining that at least a portion of the second set of characteristics corresponds to another portion of the first set of characteristics comprises determining matching reference codes between the second component of the plurality of tool components and the first component of the plurality of tool components." *Id.*, Claim 16.

95.     These elements were not well-known, routine, or conventional as of the priority date, because previous creation of multi-component tool assemblies required a user with expertise to spend time and labor independently considering each component and its many characteristics independently to determine whether each component would work together and also function as the user desires. Furthermore, it would be extremely difficult for an individual user to consider all of the many factors and ideal operating conditions for each component to determine if the assembly

would operate optimally. The claim elements of the '387 Patent, which solved this problem, were not known in the art.

96.    The claims of the '322 Patent recite more than generic computer functionality and recite steps that were not purely conventional as of the priority date. The claims of the '322 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "receiving an indication from the user of a desired characteristic of the cutting tool assembly;" automatically determining that at least a portion of a first set of characteristics associated with a first tool component of the plurality of tool components corresponds to the desired characteristic;" automatically identifying a second tool component of the plurality of tool components that is compatible with the first tool component; "identifying to the user a combination, comprising the first and second tool components, as the cutting tool assembly;" ('322 Patent, Claim 1); "the set of characteristics comprises an indication of at least one of: a material the insert is structured to machine, a dimension of the insert, a shape of the insert, or a quantity of cutting edges included on the insert" ('322 Patent, Claim 7); "receiving an indication from the user of a desired characteristic of at least one of the cutting tool assembly or of a workpiece to be machined;" "determining that at least a portion of a set of characteristics associated with a first tool component of the plurality of tool components corresponds to the desired characteristic;" identifying a second tool component of the plurality of tool components that is compatible with the first tool component, based on reference codes of the first and second tool components that indicate compatible components;" "identifying to the user a combination, comprising the first and second tool components, as the cutting tool assembly;" (*Id.*, Claim 17); "automatically determining that at least a portion of a set of characteristics associated with a first tool component of the plurality of tool components corresponds to at least one desired characteristic received from a user;" automatically identifying a second tool

component of the plurality of tool components that is compatible with the first tool component;" "grouping the first component and the second component together to form a combination in response to said identifying of the second tool component;" "selecting the combination as the cutting tool assembly in response to said grouping." *Id.*, Claim 22.

97.    These elements were not well-known, routine, or conventional as of the priority date, because previous creation of multi-component tool assemblies required a user with expertise to spend time and labor independently considering each component and its many characteristics independently to determine whether each component would work together and also function as the user desires. Furthermore, it would be extremely difficult for an individual user to consider all of the many factors and ideal operating conditions for each component to determine if the assembly would operate optimally. The claim elements of the '322 Patent, which solved this problem, were not known in the art.

98.    The claims of the Patents-in-Suit thus recite improvements over prior art and conventional systems and methods for creating multi-component cutting tool assembles and represent meaningful limitations and/or inventive concepts. The mechanisms by which the claims of the Patents-in-Suit solve the problems in the prior art are recited with specificity and explain how results are obtained in a non-abstract way. Further, in view of these specific improvements, the claims of the Patents-in-Suit, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the earliest priority date of the Patents-in-Suit.

## <u>COUNT I</u>

### (Infringement of U.S. Patent No. 9,817,387)

99.    Kennametal incorporates by reference Paragraphs 1–98.

100.   Defendants directly infringe, literally or under the doctrine of equivalents, one or more claims of the '387 Patent, either literally or under the doctrine of equivalents, by making, using, selling, and/or offering for sale within the United States and/or importing into the United States products that are covered by one or more claims of the '387 Patent. These products include, but are not limited to the MachiningCloud Platform.

101.   For example, Claim 1 of the '387 Patent recites:

[preamble] A method of identifying a cutting tool assembly to a user, the cutting tool assembly including at least two tool components selected from among a plurality of tool components, the method comprising:

[a] receiving an indication from the user of a desired characteristic of at least one of the cutting tool assembly or of a workpiece to be machined;

[b] determining that at least a portion of a first set of characteristics associated with a first component of the plurality of tool components corresponds to the desired characteristic;

[c] determining that at least a portion of a second set of characteristics associated with a second component of the plurality of tool components corresponds to another portion of the first set of characteristics;

[d] grouping the first component and the second component together to form a combination in response to said determining that at least a portion of the second set of characteristics corresponds to another portion of the first set of characteristics; and

[e] identifying the combination to the user as the cutting tool assembly,

[f] wherein the portion of the second set of characteristics and the other portion of the first set of characteristics comprise a reference code associated, respectively, with each of the second component of the plurality of tool components and the first component of the plurality of tool components, the reference code including a plurality of alphanumeric characters,

[g] wherein matching reference codes indicate compatible components,

[h] wherein said determining that at least a portion of the second set of characteristics corresponds to another portion of the first set of characteristics comprises determining matching reference codes between the second component of the plurality of tool components and the first component of the plurality of tool components.

102.    The features of claim 1 of the '387 Patent are practiced by the accused products, including at least the MachiningCloud Platform.

103.    To the extent the preamble is found to be limiting, it is satisfied by the MachiningCloud Platform, which involves a method of identifying a cutting tool assembly to a user through features such as "Tool Selection," and "Tool Advisor." *See, e.g.,* https://www.machiningcloud.com/why-machiningcloud/; https://www.machiningcloud.com/get-started/; https://www.machiningcloud.com/app/en/search/globalsearch/catalog. The MachiningCloud Platform further includes multiple different tool components for selection in a cutting tool assembly, such as numerous mills, drills, adapters, holders, tool bodies, and inserts, and builds virtual 3D tool assemblies in optimum combinations of inserts, holders, bodies, adaptors, etc. wherein the components are validated to be compatible to one another. *Id.*

104.    The MachiningCloud Platform satisfies element [a], as it receives an indication from the user of a desired characteristic using the "Filters" field, where a user may indicate items such as a dimension of a cutting tool (e.g., "DC – Cutting Diameter," "APMX – Depth of Cut Maximum," "RE – Corner Radius"), number of flutes (e.g., "NOF – Flute Count"), grade of an insert (e.g., "GRDMFG – Grade Manufacturer's Designation"), and/or workpiece to be machined (e.g., "Workpiece Material"). *See, e.g.,* https://www.machiningcloud.com/app/en/search/globalsearch/listview/node/1017/solid-end-mills.

105.    The MachiningCloud Platform satisfies element [b] by determining, for example, a depth of cut maximum dimension included in a set of characteristics for a solid end mill—for example, a desired 20.00mm depth of cut maximum ("APMX"). *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 10:49.

106.    The MachiningCloud Platform satisfies element [c] by, for example, determining that a workpiece-end shank style for a chuck is compatible with the machine-end shanks style for the solid end mill. *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 11:25–12:08. In particular, the MachiningCloud Platform identifies only those compatible chucks that have the correct "connection codes" to a particular solid end mill. *Id.*

107.    The MachiningCloud Platform satisfies element [d] by, for example, grouping the solid end mill and the chuck together to form a combination in response to said determining that the workpiece-end shank style for the chuck corresponds to the machine-end shank style for the solid end mill. *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 12:16.

108.    The MachiningCloud Platform satisfies element [e], by, for example, identifying the compatible solid end mill and chuck to the user as the cutting tool assembly. *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 21:08.

109.    The MachiningCloud Platform satisfies element [f] as, for example, the workpiece-end shank style for the chuck and the machine-end shank style for the solid end mill comprise a "connection codes" associated, respectively, with each of the second component of the plurality of tool components and the first component of the plurality of tool components, which the MachiningCloud Platform uses to determine "a compatible item" with a first component. The "connection code" the is made of a plurality of alphanumeric characters, based on the ISO 13399 standard and/or DIN 4000 standard. *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 11:45, 31:12.

110.    The MachiningCloud Platform satisfies element [g], by, for example, matching "connection codes" indicate compatible components. *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 31:12.

111.    The MachiningCloud Platform satisfies element [h] by determining, for example, that the workpiece-end shank style for the chuck corresponds to the machine-end shank style for the solid end mill, comprises determining matching connection codes between the chuck and the solid end mill. *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 11:45, 31:12.

112.    MachiningCloud indirectly infringes one or more claims of the '387 Patent by its instructions to their customers and their creation and distribution of marketing, promotional, and instructional materials. The promotional and product literature for the MachiningCloud Platform is designed to instruct, encourage, enable, and facilitate the user of the MachiningCloud Platform to use the MachiningCloud Platform in a manner that directly infringes the '387 Patent. MachiningCloud further provides instructions, support, and technical assistance to their customers in support of committing the infringement, and the MachiningCloud Platform has no substantial non-infringing uses.

113.    Kennametal has been and continues to be injured by MachiningCloud's infringement of the '387 Patent. Kennametal is entitled to recover damages adequate to compensate it for MachiningCloud's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

114.    Unless enjoined by this Court, MachiningCloud's acts of infringement will continue to damage and cause irreparable harm to Kennametal.

## COUNT II

### (Infringement of U.S. Patent No. 10,754,322)

115.    Kennametal incorporates by reference Paragraphs 1–114.

116.    Defendants directly infringe, literally or under the doctrine of equivalents, one or more claims of the '322 Patent, either literally or under the

doctrine of equivalents, by making, using, selling, and/or offering for sale within the United States and/or importing into the United States products that are covered by one or more claims of the '322 Patent. These products include, but are not limited to the MachiningCloud Platform.

117.    For example, Claim 1 of the '322 Patent recites:

[preamble] A method of identifying a cutting tool assembly to a user, the cutting tool assembly including at least two tool components selected from among a plurality of tool components, the method comprising:

[a] receiving an indication from the user of a desired characteristic of the cutting tool assembly;

[b] automatically determining that at least a portion of a first set of characteristics associated with a first tool component of the plurality of tool components corresponds to the desired characteristic;

[c] automatically identifying a second tool component of the plurality of tool components that is compatible with the first tool component; and

[d]identifying to the user a combination, comprising the first and second tool components, as the cutting tool assembly;

[e] wherein receiving an indication from the user comprises receiving from the user an indication of dimensional information of one or more of the first and second tool components, wherein at least one of the first and second tool components is a component that does not contact a workpiece.

118.    The features of claim 1 of the '322 Patent are practiced by the accused products, including at least the MachiningCloud Platform.

119.    To the extent the extent the preamble is found to be limiting, it is satisfied by the MachiningCloud Platform, which involves a method of identifying a cutting tool assembly to a user through features such as "Tool Selection," and "Tool Advisor." *See, e.g.,* https://www.machiningcloud.com/why-machiningcloud/; https://www.machiningcloud.com/get-started/;

https://www.machiningcloud.com/app/en/search/globalsearch/catalog. The MachiningCloud Platform further includes multiple different tool components for selection in a cutting tool assembly, such as numerous mills, drills, adapters, holders, tool bodies, and inserts, and builds virtual 3D tool assemblies in optimum combinations of inserts, holders, bodies, adaptors, etc. wherein the components are validated to be compatible to one another. *Id.*

120.   The MachiningCloud Platform satisfies element [a], as it receives an indication from the user of a desired characteristic using the "Filters" field, where a user may indicate items such as a dimension of a cutting tool (e.g., "DC – Cutting Diameter," "APMX – Depth of Cut Maximum," "RE – Corner Radius"), number of flutes (e.g., "NOF – Flute Count"), and/or grade of an insert (e.g., "GRDMFG – Grade Manufacturer's Designation"). *See, e.g.,* https://www.machiningcloud.com/app/en/search/globalsearch/listview/node/1017/solid-end-mills.

121.   The MachiningCloud Platform satisfies element [b] by identifying, for example, that a depth of cut maximum dimension included in a set of characteristics for a solid end mill corresponds to the desired characteristic—for example, a desired 20.00mm depth of cut maximum ("APMX"). *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 10:49.

122.   The MachiningCloud Platform satisfies element [c] by, for example, automatically identifying, after a solid end mill is selected, an "adaptive item" (such as a chuck) that is compatible with that particular solid end mill. *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 11:25.

123.   The MachiningCloud Platform satisfies element [d] by, for example, identifying to the user a combination comprising the solid end mill and compatible chuck as the cutting tool assembly. *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 21:08.

124.   The MachiningCloud Platform satisfies element [e] by, for example, receiving from the user an indication of a depth of cut maximum of the solid end mill and/or the chuck. *See, e.g.,* https://www.youtube.com/watch?v=qWWpzT-lCkU, at 10:49. For example, the MachiningCloud Platform receives from the user an indication of a 12.00mm depth of cut maximum, indicating a 12.00mm APMX for the solid end mill. *Id.* Additionally, the MachiningCloud Platform receives from the user an indication of a 12.00mm diameter, indicating a 12.00mm cutting diameter of the solid end mill and a 12.00mm connection diameter workpiece side ("DCONWS") of the chuck. *Id.*

125.   Defendants indirectly infringe one or more claims of the '322 Patent by its instructions to their customers and their creation and distribution of marketing, promotional, and instructional materials. The promotional and product literature for the MachiningCloud Platform is designed to instruct, encourage, enable, and facilitate the user of the MachiningCloud Platform to use the MachiningCloud Platform in a manner that directly infringes the '322 Patent. Defendants further provide instructions, support, and technical assistance to their customers in support of committing the infringement, and the MachiningCloud Platform has no substantial non-infringing uses.

126.   Kennametal has been and continues to be injured by Defendants' infringement of the '322 Patent. Kennametal is entitled to recover damages adequate to compensate it for Defendants' infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

127.   Unless enjoined by this Court, Defendants' acts of infringement will continue to damage and cause irreparable harm to Kennametal.

## COUNT III

### (Violation of Defend Trade Secrets Act (18 U.S.C. §§ 1836–39))

128.   Kennametal incorporates by reference Paragraphs 1–127.

129.    Kennametal's Trade Secrets constitute trade secrets under the Defend Trade Secrets Act. 18 U.S.C. § 1839(3). (*See* Paragraph 42, above).

130.    Kennametal's Trade Secrets are not available for others in the industry to use through any legitimate means.

131.    Kennametal's Trade Secrets derive independent economic value from not being generally known, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3)(B).

132.    Kennametal has and continues to engage in reasonable efforts to maintain the secrecy and confidentiality of its Trade Secrets. These efforts include, but are not limited to, the maintenance of comprehensive protocols and policies regarding treatment of confidential and trade secret property belonging to Kennametal, the use of secure networks and IT systems, strong authentication and password requirements, configuration of security systems to compartmentalize and limit access to sensitive and confidential information to the least number of necessary personnel, and confidentiality agreements with customers, vendors, partners, and employees (including non-disclosure obligations that survive separation), all to maintain the secrecy of Kennametal's Trade Secrets. (*See* Paragraphs 45–51, above). 18 U.S.C. § 1839(3)(A).

133.    Kennametal shared its Trade Secrets with MachiningCloud under the protection of the parties' Agreement, which included strict use restrictions and non-disclosure obligations for Kennametal's Confidential Information (including the Trade Secrets).

134.    MachiningCloud has misused Kennametal's customer list, which is a Trade Secret, to promote its competitive MachiningCloud Platform and solicit Kennametal customers away from the Novo platform to the MachiningCloud Platform. MachiningCloud only has access to this customer list because of its

contractual duty under the Agreement to provide operational and maintenance services on the Novo platform.

135.    Further, MachiningCloud's communication to Kennametal's customer list notifying them that their saved data and projects created in Novo will be available to them in MachiningCloud's competing platform, even following termination of the Agreement, reveals that MachiningCloud intends to misuse Kennametal's other Trade Secrets going forward in the MachiningCloud Platform. Kennametal's confidential Rules automate the entire process of searching for and picking between products in order to develop a tooling assembly in Novo. Thus, any saved data and projects created in Novo which are available in the MachiningCloud Platform are derived from Kennametal's Trade Secrets, including the output of customer searches, saved projects and assemblies, and browsing history that Novo users generate with Kennametal's Rules.

136.    MachiningCloud's recent commitment to "delete the Rules" upon termination of the Agreement is therefore not a sufficient or credible response to Kennametal's termination of the Agreement and request that MachiningCloud return or destroy Kennametal's Confidential Information. The Rules are also only one aspect of the substantial provision of Confidential Information that Kennametal disclosed to MachiningCloud pursuant to the Agreement.

137.    MachiningCloud has also failed to confirm that they will delete and/or stop communications to Kennametal's customer list, which is an additional Trade Secret and/or Confidential Information that MachiningCloud has access to solely through its contractual relationship with Kennametal.

138.    These actions by MachiningCloud constitute misappropriation under 18 U.S.C. § 1839(5), giving rise to the remedies described in 18 U.S.C. § 1836(b)(3).

139.    As a direct result of MachiningCloud's misappropriation, Kennametal has incurred actual damages, including unjust enrichment damages, in an amount to be proven at trial. 18 U.S.C. § 1836(b)(3)(B).

140.   MachiningCloud's misappropriation of Kennametal's Trade Secrets was willful and malicious because MachiningCloud intentionally disregarded the Agreement's prohibitions against "us[ing] or exploit[ing ]any of [Kennametal's] Confidential Information directly or indirectly for its own benefit" and "copy[ing], duplicat[ing], reproduc[ing], or transcrib[ing] [Kennametal's] Confidential Information" for purposes not necessary or contemplated by the Agreement, or expressly forbidden by the Agreement. (Agreement §§ 9.5, 9.7).

141.   MachiningCloud's willful and malicious acts entitle Kennametal to exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C)–(D).

142.   Furthermore, as a direct and proximate result of MachiningCloud's knowing, willful, and malicious misappropriation, Kennametal has suffered and will suffer injuries of a continuing nature for which Kennametal has no adequate remedy at law.

143.   Unless enjoined by order of this Court, MachiningCloud will gain an irreversible competitive advantage by obtaining an improper benefit through its misappropriation of Kennametal's Trade Secrets, which were created through Kennametal's significant investment of time and resources.

144.   Therefore, pursuant to 18 U.S.C. § 1836(b)(3)(A), Kennametal also respectfully requests that this Court grant an injunction (a) enjoining MachiningCloud from further misappropriation of Kennametal's Trade Secrets, (b) enjoining MachiningCloud from deploying or utilizing any aspect of its MachiningCloud Platform that includes Kennametal's Trade Secrets or was developed in reliance on Kennametal's Trade Secrets, and (c) directing MachiningCloud to identify and return all of Kennametal's Trade Secrets to Kennametal along with a signed verification that it has not coped or retained any document, file, or other information reflecting Kennametal's Trade Secrets.

145.   Kennametal further requests that the Court award Kennametal damages, including for actual loss, unjust enrichment, damages as measured by other methods,

1  exemplary damages, and attorneys' fees arising from MachiningCloud's violations of

2  the federal Defend Trade Secrets Act from the date of the misappropriation and

3  through the date of the Court's injunction against MachiningCloud's continued use of

4  Kennametal's Trade Secrets. 18 U.S.C. § 1836(b)(3)(B)–(D).

## COUNT IV

### (Violation of California Uniform Trade Secrets Act

### Cal. Civ. Code § 3436, et. seq.)

8  146.   Kennametal incorporates by reference Paragraphs 1–145.

9  147.   At all relevant times, Kennametal owned the Trade Secrets described

10  above, which constitute trade secrets under the California Uniform Trade Secrets Act.

11  (*See* Paragraph 42 above). Cal. Civ. Code § 3426, *et seq.*

12  148.   Kennametal has and continues to engage in reasonable efforts to

13  maintain the secrecy and confidentiality of its Trade Secrets. These efforts include,

14  but are not limited to, the maintenance of comprehensive protocols and policies

15  regarding treatment of confidential and Trade Secret property belonging to

16  Kennametal, the use of secure networks and IT systems, strong authentication and

17  password requirements, configuration of security systems to compartmentalize and

18  limit access to sensitive and confidential information to the least number of necessary

19  personnel, and confidentiality agreements with customers, vendors, partners, and

20  employees (including non-disclosure obligations that survive separation), all to

21  maintain the secrecy of Kennametal's Trade Secrets. (*See* Paragraphs 45–51, above).

22  Cal. Civ. Code § 3426.1(d)(2).

23  149.   Kennametal's Trade Secrets are not legitimately known to other persons

24  who can obtain economic value from their disclosure or use, and they derive

25  independent economic value from the fact that they are not so known and from the

26  fact that they enable Kennametal to maintain a competitive advantage in its industry.

27  Cal. Civ. Code § 3426.1(d)(1).

28

150.    MachiningCloud had access to Kennametal's Trade Secrets through the Agreement between the parties, which was executed for the purpose of developing Novo and contained strict use provisions that prohibited MachiningCloud from using Kennametal's Trade Secrets for any other purposes.

151.    MachiningCloud has misused Kennametal's confidential customer list, which qualifies as a trade secret, to solicit Kennametal customers away from the Novo platform to its competitive MachiningCloud Platform. MachiningCloud only had access to this customer list because of its contractual duty under the Agreement to provide operational and maintenance services to the Novo platform.

152.    MachiningCloud's communication to Kennametal's customer list notifying them that their saved data and projects created in Novo will be available to them in MachiningCloud's competing platform, even following termination of the Agreement, reveals that MachiningCloud intends to misuse Kennametal's other Trade Secrets going forward in the MachiningCloud Platform. Kennametal's confidential Rules automate the entire process of searching for and picking between products in order to develop a tooling assembly in Novo. Thus, any saved data and projects created in Novo which are available in the MachiningCloud Platform are derived from Kennametal's Trade Secrets, including the output of customer searches, saved projects and assemblies, and browsing history that Novo users generate with Kennametal's Rules.

153.    MachiningCloud's recent commitment to "delete the Rules" upon termination of the Agreement is therefore not a sufficient or credible response to Kennametal's termination of the Agreement and request that MachiningCloud return or destroy Kennametal's Confidential Information. The Rules are also only one aspect of the substantial provision of Confidential Information that Kennametal disclosed to MachiningCloud pursuant to the Agreement.

154.    MachiningCloud has also failed to confirm that they will delete and/or stop communications to Kennametal's customer list, which is an additional Trade

Secret and/or Confidential Information that MachiningCloud has access to solely through its contractual relationship with Kennametal.

155.   These actions by MachiningCloud constitute "misappropriation" under Cal. Civ. Code § 3426.1(b).

156.   MachiningCloud's misappropriation of Kennametal's Trade Secrets has caused damage and will continue to cause damage to Kennametal.

157.   Furthermore, MachiningCloud's misappropriation of Kennametal's Trade Secrets was willful and malicious. Kennametal is therefore entitled to an award of exemplary damages and recovery of its reasonable attorneys' fees and costs. Cal. Civ. Code § 3426.4.

158.   As a direct and proximate result of MachiningCloud's knowing, willful, and malicious misappropriation, Kennametal has also suffered and will suffer injuries of a continuing nature for which Kennametal has no adequate remedy at law.

159.   Unless enjoined by order of this Court, MachiningCloud will gain an irreversible competitive advantage by obtaining an improper benefit through its misappropriation of Kennametal's Trade Secrets, which were created through Kennametal's enormous investment of time and resources.

160.   Therefore, pursuant to Cal. Civ. Code § 3426.2, Kennametal also respectfully requests that this Court grant an injunction (a) enjoining MachiningCloud from further misappropriation of Kennametal's Trade Secrets, (b) enjoining MachiningCloud from deploying or utilizing any aspect of its MachiningCloud Platform that includes Kennametal's Trade Secrets or was developed in reliance on Kennametal's Trade Secrets, and (c) directing MachiningCloud to identify and return all of Kennametal's Trade Secrets to Kennametal along with a signed verification that it has not coped or retained any document, file, or other information reflecting Kennametal's Trade Secrets.

161.   Kennametal further requests that the Court award Kennametal damages for actual losses caused by MachiningCloud's misappropriation, as well as unjust

enrichment damages and exemplary damages, from the date of the misappropriation and through the date of the Court's injunction against MachiningCloud's continued use of Kennametal's Trade Secrets. Cal. Civ. Code § 3426.3.

## COUNT V

### (Breach of Contract)

162.    Kennametal incorporates by reference Paragraphs 1–161.

163.    The Agreement between Kennametal and MachiningCloud constitutes a valid and binding contract under California law.

164.    Kennametal performed all of its obligations under the Agreement, including by providing its Beyond Machining Data, including Kennametal's Confidential Information, to MachiningCloud for its incorporation into and the development of the Novo platform. (Agreement § 3 *et seq*).

165.    MachiningCloud breached the Agreement by utilizing Kennametal's nonpublic customer list to contact Novo users in order to solicit them to transfer their business from Novo to the MachiningCloud Platform, and by failing to return Kennametal's Confidential Information upon Kennametal's written request and notice of termination of the Agreement.

166.    Through this conduct, MachiningCloud has breached at least the following terms of the Agreement, wherein it was obligated:

        a. "to take all steps necessary to protect the Confidential Information, received from [Kennametal], from unauthorized use or disclosure," "not to disclose [Kennametal's] Confidential Information in any way or in any form to third parties without [Kennametal] receiving prior specific written authorization to do so" and "to disclose the Confidential Information only to those of its officers, directors, employees or others under its control who have a need to know the Confidential Information to achieve the purposes of this Agreement,

all of whom will be required by [MachiningCloud] to protect it in accordance with this Agreement" (§ 9.4);

b. "to use the [Kennametal's] Confidential Information solely for the purposes of this Agreement" and "not to use or exploit any of the [Kennametal's] Confidential Information directly or indirectly for its own benefit or for the benefit of any third party in a manner inconsistent with such purpose" (§ 9.5);

c. "not to copy, duplicate, reproduce or transcribe [Kennametal's] Confidential Information, except as may be necessary for the purposes of this Agreement" (§ 9.7); and

d. Following termination of the agreement and "upon the written request of [Kennametal]," to "promptly return, or certify the destruction of, all Confidential Information received from [Kennametal] hereunder, including copies[.]" (§ 9.11).

167. Kennametal has been directly damaged by MachiningCloud's breaches of the Agreement, including by the wrongful disclosure and use of its Confidential Information, the wrongful solicitation of its customers through MachiningCloud's use of its Confidential Information, and the resulting loss of business and competitive advantage.

## **COUNT VI**

### **(Intentional Interference with Economic Relations)**

168. Kennametal incorporates by reference Paragraphs 1–167.

169. Kennametal had an established economic relationship with actual, specific, and identifiable customers through the Novo platform, who utilized Novo to browse, save, and purchase tooling assemblies derived from Kennametal's suite of products and based on Kennametal's Trade Secrets and/or Confidential Information which provided guidance to the customer on organizing and optimizing cohesive tool

assemblies. Those customers could save such tool assemblies on their Novo profile
and come back later to make changes and purchase their assemblies.

170.   Under the Agreement, MachiningCloud provided ongoing technical
support and software maintenance for Novo following commercialization.
(Agreement p. 17). By virtue of these contractual obligations, MachiningCloud had
access to the list of Kennametal customers with Novo accounts, including those
customers' contact information, purchase history, browsing and assembly history, and
other related data.

171.   MachiningCloud abused its access to Kennametal's customer lists in
order to send Novo customers a message on March 25, 2025 informing them that it
planned to "discontinue support of the Novo platform," but would be providing
customers "with a seamless transition and are offering all existing Novo customers…
a complimentary subscription to the MachiningCloud.com platform." The message
further stated that the customers "existing Novo credentials will remain valid on the
MachiningCloud platform" and "[u]pon logging in, [they] will find all [their] saved
data, including tool lists, jobs, assemblies, and other relevant information, readily
accessible." (Exhibit 2).

172.   MachiningCloud also informed Novo customers in this March 25
message that, on their competitive platform, they would have:

     a. "Access to a comprehensive selection of tools from more than 60
        leading manufacturers.

     b. An intuitive and efficient user interface for streamlined tooling
        management.

     c. Advanced features for calculating fees and speeds based on material
        types.

     d. AI-powered tool selection tools to optimize [their] manufacturing
        processes.

e.  Unparalleled data access and solutions to drive innovation and
success." (*Id*).

173.  On April 9, 2025, MachiningCloud sent another message to Novo
customers again through its misuse of its access to Kennametal's customer lists,
inviting those customers to "see what [they're] missing" at a "MachiningCloud vs.
NOVO webinar" scheduled for April 23, 2025. (Exhibit 3).

174.  MachiningCloud invited Novo customers to see how MachiningCloud
could provide:

a.  "Access to tooling from **63 other leading manufacturers**, all in one
place

b.  Direct **checkout with MSC Industrial Supply**

c.  The ability to **upload [their] own tool data**

d.  The powerful **MachiningCloud Tool Advisor** for optimized
selection

e.  **Multibrand tooling assemblies** for real-world setups

f.  **Free Form mode** for flexible, intuitive workflows[.]" (*Id*).

175.  The message ended: "Whether you're curious or actively
exploring better ways to manage tooling data and selection, this webinar
is for you." (*Id*).

176.  As stated above, MachiningCloud was only able to make these improper
solicitations of Kennametal's customers via its misappropriation of Kennametal's
Trade Secrets and/or Confidential Information, including its nonpublic list of Novo
customers.

177.  MachiningCloud's improper use of Kennametal's Confidential
Information was also a breach of the terms of the Agreement, including § 9.5 in
which MachiningCloud agreed "not to use or exploit any of the [Kennametal's]
Confidential Information directly or indirectly for its own benefit or for the benefit of
any third party in a manner inconsistent with such purpose."

178.   MachiningCloud's conduct caused an actual disruption to the economic relationship between Kennametal and its Novo customers in announcing to those customers that it would "discontinue support" for the Novo platform in the near future (implying the platform would no longer be operational or accessible), when in fact customers would still be able to obtain the benefits of Kennametal's proprietary rules and logic through the Kennametal Platform, and offering customers a "seamless transition" to its competitive platform, which MachiningCloud touted as providing "unparalleled data access and solutions" for customers, as well as other features, and inviting the Novo customers to a webinar to "see what [they're] missing" on the MachiningCloud platform.

179.   MachiningCloud's communications to the Novo users were also fraudulent and misleading, because MachiningCloud is attempting to convey to customers that it is the owner of Kennametal's Trade Secrets and/or Confidential Information and once it discontinues its support of the Novo platform, Kennametal customers will have to use the MachiningCloud Platform to access the services and benefits provided by Kennametal's Trade Secrets and/or Confidential Information. This messaging is false and fraudulent because Novo users will not be losing access to these services and benefits, but would in fact be able to retain access to the services and benefits provided by Kennametal's Trade Secrets and/or Confidential Information via the Kennametal Platform. MachiningCloud is not the owner of the Trade Secrets and/or Confidential Information and is improperly misappropriating them for continued use on the MachiningCloud Platform, even following termination of the Agreement.

180.   These interferences by MachiningCloud caused and will continue to cause economic harm to Kennametal. MachiningCloud's messages to Kennametal customers, who are current users of Novo and are actively browsing and shopping on Novo for exclusively Kennametal products, signal that this familiar platform will soon be disappearing and these customers should instead continue their browsing and

1  shipping on the MachiningCloud platform, where Kennametal's products will be in

2  competition with the products of 63 of its competitors.

3       181.   MachiningCloud has therefore created a false sense of instability for the

4  Novo platform, which damages Kennametal's relationships with Novo customers,

5  and has enticed Novo customers to shop on its non-exclusive platform, which is

6  plainly a less favorable forum for Kennametal to market its products than its own

7  exclusive platform.

8       182.   On information and belief, MachiningCloud's wrongful interferences

9  have already caused Kennametal to lose customers and business on the Novo

10  platform, and they will continue to do so.

11       183.   Therefore, Kennametal is entitled to damages resulting from

12  MachiningCloud's intentional and fraudulent interference with its economic relations,

13  including Kennametal's actual losses, the harm to its reputation, its consequential

14  losses, and punitive damages.

15                              **COUNT VII**

16              **(Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

17       184.   Kennametal incorporates by reference Paragraphs 1–183.

18       185.   MachiningCloud's conduct as alleged herein constitutes unlawful and

19  fraudulent business practices prohibited by § 17200 *et seq.* of the California Business

20  & Professions Code.

21       186.   As shown above, MachiningCloud has breached its obligations under the

22  parties' Agreement and engaged in violations of federal and California trade secrets

23  laws. These actions constitute unlawful business practices under Cal. Bus. & Prof.

24  Code § 17200.

25       187.   MachiningCloud's attempts to pass off Kennametal's Trade Secrets

26  and/or Confidential Information as their own, by publicly announcing to Novo users

27  that it is discontinuing its support of the Novo Platform, and providing Novo users

28  with a "seamless transition" to the MachiningCloud Platform where users' "saved

data, including tool lists, jobs, assemblies, and other relevant information" will be available upon transfer, are deceiving and confusing or have the capacity to deceive or confuse Kennametal's customers, and therefore also constitute fraudulent business practices under Cal. Bus. & Prof. Code § 17200.

188.   As a result of MachiningCloud's unlawful, unfair, and fraudulent business practices, Kennametal has and will continue to suffer loss of business.

189.   Kennametal is therefore entitled to damages in the form of restitution for the business and profits that MachiningCloud has gained through its unlawful and fraudulent business practices and requests the Court grant this remedy in an amount to be determined at trial pursuant to Cal. Bus. & Prof. Code § 17203.

190.   Kennametal also requests that this Court should issue an injunction, pursuant to Cal. Bus. & Prof. Code § 17203, restraining and enjoining MachiningCloud from continuing the unlawful and fraudulent business practices set forth herein.

## VI.    PRAYER FOR RELIEF

Kennametal respectfully requests the following relief:

A.    That the Court enter judgment that MachiningCloud willfully infringed each of the Patents-in-Suit, misappropriated Kennametal's Trade Secrets under federal and California law, breached the parties' Agreement, intentionally interfered with Kennametal's economic relations, and engaged in unlawful and fraudulent business practices in violation of California law;

B.    That the Court award damages for MachiningCloud's patent infringement, including interest;

C.    That the Court grant an injunction against MachiningCloud from infringing the Patents-in-Suit, including enjoining the operation of the MachiningCloud Platform insofar as it infringes on the Patents-in-Suit;

1      D.    That the Court award treble damages and attorneys' fees under 35
2            U.S.C. §§ 284 and 285;
3      E.    That the Court grant an injunction enjoining MachiningCloud from
4            further misappropriation of Kennametal's Trade Secrets under 18 U.S.C.
5            § 1836(b)(3)(A) and Cal. Civ. Code § 3426.2;
6      F.    That the Court award Kennametal damages for its actual losses,
7            MachiningCloud's unjust enrichment, exemplary damages, and
8            Kennametal's attorneys fees and costs, for MachiningCloud's
9            misappropriation of Kennametal's Trade Secrets pursuant to 18 U.S.C. §
10           1836(b)(3)(B)–(D) and Cal. Civ. Code §§ 3426.3–3426.4;
11     G.    That the Court award Kennametal all damages resulting from
12           MachiningCloud's breach of the parties' Agreement;
13     H.    That the Court award Kennametal consequential, compensatory, and
14           punitive damages caused by MachiningCloud's intentional interference
15           with Kennametal's economic relations;
16     I.    That the Court grant an injunction restraining and enjoining
17           MachiningCloud from its unlawful and fraudulent business practices,
18           and award Kennametal restitution damages pursuant to Cal. Bus. & Prof.
19           Code § 17203;
20     J.    That the Court award Kennametal its other statutory costs; and
21     K.    That the Court award Kennametal any and all other relief to which
22           Kennametal may be entitled and that the Court may deem just, equitable,
23           and proper.

## JURY DEMAND

Kennametal respectfully demands a jury trial pursuant to Rule 38(b) of the
Federal Rules of Civil Procedure on all claims and issues so triable.

/ / /

/ / /

KENNAMETAL INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED
COMPLAINT AND COUNTERCLAIMS                                                     70
2:25-CV-02158-SB-AJR

1   DATED:  August 6, 2025     Respectfully submitted,

2                      KILPATRICK TOWNSEND & STOCKTON LLP

3

4                      By: _*/s/Steven D. Moore*_____
                          STEVEN D. MOORE

5

6                      Attorneys for Defendant
                      KENNAMETAL INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28